# United States Court of Appeals for the Federal Circuit

---

**PARSONS GLOBAL SERVICES, INC.**
**(ON BEHALF OF ODELL INTERNATIONAL, INC.),**
*Appellant,*

**v.**

**JOHN MCHUGH, SECRETARY OF THE ARMY,**
*Appellee.*

---

2011-1201

---

Appeal from the Armed Services Board of Contract Appeals in no. 56731, Administrative Judge Robert T. Peacock.

---

Decided: April 20, 2012

---

ROBERT M. TYLER, McGuire Woods, LLP, of Houston, Texas, argued for appellant. On the brief was JAMES J. GALLAGHER, McKenna Long & Aldridge LLP, of Los Angeles, California.

STACEY K. GRIGSBY, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellee. With her on the brief were TONY WEST, Assistant Attorney

General, JEANNE E. DAVIDSON, Director, and BRYANT G. SNEE, Deputy Director.

---

Before RADER, *Chief Judge*, NEWMAN and PROST, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* PROST. Dissenting opinion filed by *Circuit Judge* NEWMAN.

PROST, *Circuit Judge*.

This is an appeal from the Armed Services Board of Contract Appeals ("Board") regarding whether the Board has jurisdiction over Parsons Global Services, Inc.'s ("Parsons") sponsored claim on behalf of subcontractor Odell International, Inc. ("Odell"). The Board held that Parsons's request for payment was "routine" and thus, under 48 C.F.R. (FAR) § 2.101, needed to be in dispute to constitute a claim over which the Board had jurisdiction. Because we agree that the Board did not have jurisdiction over Parsons's request for payment, we affirm.

BACKGROUND

In March 2004, the Army awarded Parsons contract no. W914NS-04-D-006 ("the prime contract"), an indefinite-delivery-indefinite-quantity contract for design-build work in Iraq. The cost reimbursement contract incorporated various Federal Acquisition Regulations ("FAR"), including regulations relating to reimbursement of subcontractor costs during the contract and after termination for convenience. Subsequently, Parsons entered into a basic ordering agreement ("BOA agreement" or "subcontract") with Odell, effective as of March 25, 2004. The subcontract required Odell to construct health care facilities and deliver medical equipment in Iraq pursuant to

the prime contract. Initially, the contract did not specify an overhead rate.

In May 2004, prime contract Task Order 0004 was is- sued for the construction, restoration, rebuilding, and development of public projects in Iraq, and in October 2004, Task Orders 0011 and 0012 issued requiring the construction of various health care facilities in Iraq. Parsons awarded Odell subcontract task orders to support Task Orders 0004, 0011, and 0012.

On October 27, 2004, Parsons and Odell amended their subcontract, effective March 26, 2004, to reflect the parties' agreement that Odell was entitled to compensa- tion for its overhead and general and administrative ("G&A") costs. Specifically, the amendment added para- graph 1.0C(a), which states that "[a] mark-up of 1.75% will be added to Subcontractor's direct labor rates to cover G&A, [overhead] and other indirect costs . . . ." Supple- mental App. 11. In accompanying remarks, the parties noted that this provision was inadvertently omitted from the original subcontract. The parties again amended the subcontract on January 19, 2005, effective March 26, 2004, to better clarify paragraph 1.0C(a) to the subcon- tract. The newly amended language read "[a] mark-up of 1.75 (*175%*) will be added to [Odell's] direct labor rates to cover G&A, [overhead] and *some other* [in]direct costs." J.A. 3 (first emphasis added) (second and fourth altera- tions in original). Despite these amendments, Odell continued to invoice its costs to Parsons at a 75% mark- up.

On February 28, 2006, the Defense Contract Audit Agency ("DCAA") determined that Odell's provisional indirect cost rate for 2005 was 187% and informed Odell that it had been billing Parsons using the incorrect 75%

mark-up. On March 3, 2006, the Army terminated for convenience Task Orders 0004, 0011, and 0012. Four days later, on March 7, Odell submitted a memorandum to Parsons with an attached invoice for $2,113,864.99—the difference between the 75% mark-up Odell had billed Parsons and the 187% rate that DCAA determined was Odell's 2005 provisional indirect cost rate. Parsons refused to pay the invoice, explaining that the 187% was a provisional indirect rate and "its time and materials BOA with Odell did not entitle Odell to use a mark-up of 187 percent." Supplemental App. 12.

The government, through a modification to the prime contract, assigned termination contracting officer ("TCO") authority to the Defense Contract Management Agency. In July 2007, Parsons submitted a termination settlement proposal for each terminated task order to the TCO, none of which mentioned the additional costs Odell sought or any mark-up rate issues between Parsons and Odell. Pursuant to settlement of the prime contract, the TCO requested that the DCAA audit Parsons's billed costs for Task Order 0011 of the prime contract, including Odell's costs. The DCAA's June 2008 report discussed, inter alia, the appropriate mark-up for labor costs incurred under the subcontract. The DCAA clarified that the 187% mark-up discussed in its initial audit "would not apply to this subcontract as the 175% rate is a fixed rate specified in the subcontract agreement." J.A. 208.

On July 8, 2008, Odell submitted a revised invoice totaling $2,444,976 for the claimed difference between the labor costs previously billed at 75% and the costs billed at the revised mark-up of 175%.[1] In August 2008, Parsons

---

[1] Odell also submitted invoices for close-out costs related to the termination. Because these costs were not

5

submitted three Payment Approval Requests reflecting the costs submitted by Odell to the TCO. The TCO orally informed Parsons that it would not settle directly with Odell pursuant to FAR 49.108-8 because it was not in the best interest of the government. On December 22, 2008, Parsons submitted a sponsored "Certified Claim for Payment" under the Contract Disputes Act of 1978 ("CDA") on behalf of Odell to the Procurement Contracting Officer ("PCO").[2] The claim was accompanied by a CDA certification and sought reimbursement for $2,585,642.71 for costs incurred under the subcontract for Task Orders 004, 0011, and 0012.[3] On January 3, 2009, the PCO denied the claim and Parsons filed an appeal to the Board.

On appeal, the government moved to dismiss for a lack of jurisdiction, arguing that Parsons's "routine" requests for payment did not amount to a claim under the CDA. Parsons countered that because its requests for payment occurred two years after the termination of the task orders and thus could not be subject to routine invoicing and termination procedures, the request was

at issue in the Board's decision or argued before this court, we do not address them.

[2] Unlike the TCO, who was responsible exclusively for any costs, procedures, and requests that emerge from the government's termination for convenience of the prime contract, the PCO is responsible for any such issues relating to activity under the normal course of the contract.

[3] While the claim itself discussed invoices from subcontractor work flowing from Task Orders 0004, 0011, and 0012, the documents attached listed the subcontractor costs stemming from prime contract Task Order 0007. We address this discrepancy below, *see infra* note 7.

non-routine and sufficient in itself to constitute a claim. The Board agreed with the government that Parsons had failed to submit a valid sponsored claim and dismissed Parsons's appeal for lack of jurisdiction. *Parsons Global Servs., Inc.*, ASBCA No. 56731, 11-1 BCA ¶ 34,632. The Board determined that the request for Odell's costs incurred under the subcontract was "routine"; as such, it did not become a claim under the CDA until it was disputed by the government or the government unreasonably delayed payment. *Id.* Because its routine request was not in dispute, the Board held that Parsons had not submitted a claim under the CDA for which it had jurisdiction. *Id.* The Board also questioned whether Parsons, without conducting its own audit of the subcontractor costs, was actually liable to Odell for the costs because of statements that it will pay Odell only to the extent the government pays it. *Id.*

This appeal followed. We have jurisdiction to review the Board's final decision under 28 U.S.C. § 1295(a)(10).

DISCUSSION

Pursuant to 41 U.S.C. § 7107(b)(1), we review decisions by the Board on questions of law de novo. Thus, we review the Board's determination of jurisdiction under the CDA and its interpretation of the applicable FAR provisions de novo. *Sys. Dev. Corp. v. McHugh*, 658 F.3d 1341, 1344 (Fed. Cir. 2011).

As a prerequisite for the Board's jurisdiction, the CDA requires a contractor to present a valid claim over which the contracting officer has rendered a final decision. 41 U.S.C. § 7103; *England v. Swanson Grp., Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004). Because the statute itself does not define what constitutes a "claim," we evaluate

whether a particular request for payment amounts to a claim based on the FAR implementing the CDA, the language of the contract in dispute, and the facts of each case. *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1542 (Fed. Cir. 1996); *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575 (Fed. Cir. 1995) (en banc). The FAR defines "claim" as follows:

> Claim means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or related to the contract. . . . *A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim.* The submission may be converted to a claim, by written notice to the contracting officer as provided in 33.206(a), if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

FAR 2.101 (emphasis added). Under this definition, demands for payment can be classified into two categories: "routine" and "non-routine." As this court, sitting en banc, explained in *Reflectone, Inc. v. Dalton*, if the request is "non-routine," all that is required is that "it be (1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in a sum certain"; the request does not need to be in dispute. 60 F.3d at 1575-76. If the request for payment is "routine," a pre-existing dispute is necessary for it to constitute a claim under the CDA. *Id.* at 1576 & n.6.

The distinction between a routine and non-routine request for payment is a factual one, dependent on the circumstances in which the requested costs arose. A

routine request is one incurred and submitted "in accordance with the expected or scheduled progression of contract performance." *Ellett Constr.*, 93 F.3d at 1542-43. Such requests are "made under the contract, not outside it" and include invoices, vouchers, progress payments, and other requests for costs under the contract's terms. *Reflectone*, 60 F.3d at 1577. By contrast, a non-routine request is one "seeking compensation because of unforeseen or unintended circumstances." *Ellett Constr.*, 93 F.3d at 1543; *Reflectone*, 60 F.3d at 1577. Such requests include requests for equitable adjustments for costs incurred from "government modification of the contract, differing site conditions, defective or late-delivered government property or issuance of a stop work order" and other government-ordered changes, *Reflectone*, 60 F.3d at 1577; for damages resulting from the government's termination for convenience and termination settlement proposals that have reached an impasse, *Ellett Constr.*, 93 F.3d at 1542-43; for compensation for additional work not contemplated by the contract but demanded by the government, *Scan-Tech Sec., L.P. v. United States*, 46 Fed. Cl. 326, 333 (2000); for the return of contractor property in the government's possession, *J & E Salvage Co. v. United States*, 37 Fed. Cl. 256, 261 n.4 (1997), *aff'd*, 152 F.3d 945 (1998) (table); and for damages stemming from the government's breach of contract or cardinal change to the contract, *Ky. Bridge & Dam, Inc. v. United States*, 42 Fed. Cl. 501, 518-19 (1998).[4] A common thread among these examples is the presence of some unexpected or unforeseen action on the government's part that ties it to the demanded costs.

---

[4] While the Court of Federal Claims' decisions are not binding on this court, we reference them to better illustrate the distinction between routine and non-routine requests.

Both parties agree that jurisdiction over Parsons's claim rises and falls based on how its request is classified. Parsons argues that its request for the payment of Odell's overhead and G&A costs should be classified as non-routine because the DCAA did not determine Odell's entitlement to a 175% mark-up until 2008, two years after Parsons's contract was terminated and when the vehicles for submission available during the contract were no longer viable. The government counters that a request for payment that was routine before the termination of the task orders should not transform into a non-routine request merely because it is submitted after the termination. The government notes that the prime contract provides for routine request mechanisms for Odell's costs during the contract and after the termination. Furthermore, the government notes that the costs are not a result of any unforeseen circumstances but rather Odell's own billing error, and as such, the demand is closer in substance to a routine demand.

We agree with the government that Parsons's request for payment is routine. The costs originate from scheduled contract work Odell performed on Parsons's behalf from 2004 to 2006. None of the work was additional or unforeseen work at the government's behest. The prime contract explicitly covers these costs. The "Allowable Cost and Payment" provision, FAR 52.216-7, provides for the submission of invoices to the government for "costs incurred, but not necessarily paid for . . . supplies and services purchased directly for the contract and associated financial payments to subcontractors." J.A. 5. Indeed, pursuant to this provision, Parsons submitted invoices for Odell's costs and received payment from the government at a 75% mark-up. The payment Parsons now seeks—the difference between the 75% and 175% mark-up—is not a result of intervening unforeseen circumstances or gov-

ernment action. It would have been accounted for in the invoices submitted during the contract's duration if not for Odell's own billing error and both Parsons's and Odell's failure to enforce the agreed-upon terms of their 2004 subcontract. Because Parsons's request should be submitted under the prime contract and in accordance with the expected progression of contract performance, it is routine. *See Ellett Constr.*, 93 F.3d at 1543; *Reflectone*, 60 F.3d at 1577 (describing routine requests as those "submitted for work done or equipment delivered by the contractor in accordance with the expected or scheduled progress of contract performance").

Parsons admits that if submitted during the course of contract performance, its request would have been routine, yet argues that its request became non-routine after the task orders terminated because it was left with no other mechanisms for obtaining payment.[5] Parsons's argument fails because the contract's termination did not divest Parsons of mechanisms for requesting payment of Odell's costs. *See Scan-Tech Sec.*, 46 Fed. Cl. at 333 n.4

---

[5] During oral argument, the government argued for the first time that Odell's costs do not stem from any of the terminated task orders, but rather Task Order 0007, which it alleges remains open. Although the invoices accompanying Parsons's sponsored claim list Task Order 0007 as the prime contract task order corresponding to Odell's subcontract costs, this appears to be a typographical error. Those same invoices note that they relate to "DCAA Audit Correction Task Order 0011." Supplemental App. 18. Furthermore, each and every invoice submitted, including those relating to close-out costs for Task Orders 0004, 0011, and 0012, list Task Order 0007. To the extent that this is not a typographical error and the costs Parsons is seeking on Odell's behalf are related to Task Order 0007, our holding that the request is routine applies with equal force.

("[A] routine invoice for scheduled work could be submitted after the contract's termination date, yet would still be considered a routine request."). The prime contract contains post-termination mechanisms for payment of such costs, such as FAR 49.302, which allows for vouchers or fee proposals to be submitted after termination, or FAR 49.108-3, which allows prime contractors to settle with subcontractors and then submit these settlements to the TCO for approval.[6] Parsons could also amend its settlement with the government to account for the corrected mark-up. Parsons, in its briefs, alleged that none of these mechanisms are available to it two years after termination, but during oral argument it admitted that it could have submitted a voucher, but chose not to. The government affirmed that invoicing is still a viable option. Alternatively, Parsons could settle with Odell and submit the subcontractor settlement to the TCO or, in the absence of any evidence on the record that its settlement is final, amend its settlement agreement with the government to account for Odell's costs. What Parsons cannot do is classify its request as non-routine so it can submit it directly to the PCO as a claim without first pursuing the proper avenues under the prime contract.

---

[6] Determining whether a request is routine or non-routine depends largely on the facts under which it arose relative to the "overall scheme of the contract and the parties' expectations." *Ellett Constr.*, 93 F.3d at 1543. Thus, nothing in this opinion alters our previous holding that the presence of contract clauses that set forth procedures for requesting costs in unforeseen circumstances, such as differing site conditions or termination for convenience, alters the nature of an otherwise non-routine request. *See id.* at 1542-43; *see also Scan-Tech Sec.*, 46 Fed. Cl. at 333. Indeed, had the costs that Parsons requested resulted directly from the government's termination for convenience, its request would likely have been classified differently.

Because Parsons's request is routine, it must be in dispute before Parsons can submit "a written demand . . . seeking, as a matter of right, the payment of money in a sum certain" that would constitute a claim over which the Board has jurisdiction. FAR 2.101; *Reflectone*, 60 F.3d at 1577. Parsons makes no argument that its request is in dispute. Indeed, the record does not indicate that the PCO, the appropriate government official to evaluate the request at issue, ever received a proper request for payment, such as a voucher. Without a pre-exiting dispute over its routine request, Parsons has not submitted a valid claim.

The Board lacked jurisdiction over Parsons's routine request for payment and thus we affirm the Board's dismissal.[7]

**AFFIRMED**

---

[7] Because the Board does not have jurisdiction, we do not address whether Parsons was required to pay Odell prior to bringing its alleged claim.

# United States Court of Appeals for the Federal Circuit

---

**PARSONS GLOBAL SERVICES, INC.**
**(ON BEHALF OF ODELL INTERNATIONAL, INC.),**
*Appellant,*

**v.**

**JOHN MCHUGH, SECRETARY OF THE ARMY,**
*Appellee.*

---

2011-1201

---

Appeal from the Armed Services Board of Contract Appeals in No. 56731, Administrative Judge Robert T. Peacock.

---

NEWMAN, *Circuit Judge*, dissenting.

This is a simple situation, in which the government determined, through its own audit, that certain payments are owed to the subcontractor. Two contracting officers then declined to make the payments, although the obligation was not, and is not, denied. The Armed Services Board of Contract Appeals held it did not have "jurisdiction," and this court now accepts this negation of the procurement system and the Contract Disputes Act. The Defense Contract Audit Agency found that the payments are allowable, allocable, and reasonable, yet the government declines to pay, and on this appeal presents a plethora of creative excuses, none of

which were raised by the contracting officers, none of which affects the government's conceded obligation. Thus a simple correction of a billing error has morphed into a nearly four-year litigation, with no end in sight. I respectfully dissent.

The facts are not in dispute. Parsons Global Services was the prime contractor and Odell International a subcontractor for construction of some healthcare facilities in Iraq. On February 28, 2006 the DCAA determined that Odell had applied an incorrect mark-up rate for its overhead and other indirect costs. Odell used a mark-up rate of 75% instead of the contract rate of 175%; the DCAA final report in June 2008 stated that Odell's overhead and G&A costs at the 175% mark-up were supported and appropriate. Parsons submitted, in August 2008, payment requests for the under-charged mark-up. The Termination Contracting Officer declined to act on the requests separately from the Parsons termination for convenience claims, for the major portions of the Parsons contracts had been terminated for convenience on March 3, 2006. As Parsons points out, the Odell under-charges, and the DCAA confirmatory audit, all relate to the period before termination.

Parsons then, on December 22, 2008, submitted the Odell claim to the Procurement Contracting Officer, who denied the claim; the reasons for this denial are not mentioned by the Board or shown in the record provided to this court. Parsons appealed the denial to the Armed Services Board of Contract Appeals ("Board" or "ASBCA") in accordance with the Contract Disputes Act. The Act states that the Board "has jurisdiction to decide any appeal from a decision of a contracting officer." 41 U.S.C. §7105(e)(1)(A). However, the Board held that it did not have jurisdiction under the Contract Disputes Act, for the reason that Parsons had made a "routine" request for payment of the under-charged mark-up. The Board stated that "[t]he

government maintains that it has not disputed, and in fact could not dispute, its liability for payment of the costs because of the absence of such a request," and that a "routine request for payment that is not in dispute when submitted is not a claim." *Parsons Global Servs., Inc.*, ASBCA No. 56731, 11-1 BCA ¶34,632, 2010 ASBCA LEXIS 110, at **23, 24 (Dec. 3, 2010) (quoting FAR 2.101). Thus the Board declined to remedy the contracting officers' refusal to pay the amount to which the DCAA found Odell to be entitled.

Parsons has attempted to fit this situation into the language of precedent, and states that "Parsons' CDA claim was a non-routine request for payment, and the requirement that a dispute exist prior to its submission of its claim did not apply." Parsons Br. 9. The court explained in *Reflectone, Inc. v. Dalton* that if the request for payment is "non-routine," all that is required is "(1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in a sum certain." 60 F.3d 1572, 1575 (Fed. Cir. 1995) (en banc) (citing FAR 33.201). This court stated in *Reflectone* that "[a] demand for compensation for unforeseen or unintended circumstances cannot be characterized as 'routine.'" 60 F.3d at 1577. Major billing errors are neither foreseen nor intended. The government does not dispute that this claim meets the *Reflectone* criteria.

Nonetheless, the ground on which the ASBCA relied to deny its own jurisdiction is that the request is "routine." And the creative arguments now presented by government counsel, on points not raised by the contracting officers, are readily resolved or irrelevant. For example, the government now states that it needed reassurance that Parsons would pay Odell the amount that Parsons is requesting on Odell's behalf – an obligation set by law; see *Severin v. United States*, 99 Ct. Cl. 435 (1943) (a prime contractor may submit a subcontractor's pass-through claim to the government as

long as the prime contractor remains liable to pay the subcontractor the payment received from the government). The ASBCA mentioned the government's theory that perhaps Parsons should first pay Odell for its accounting error, although this was not the basis for the Board's denial of its own jurisdiction. The government mentions the termination for convenience, although it is not disputed that the DCAA audit related solely to Odell's underbillings before the termination for convenience.

Parsons complied with the protocols of claim submission as set forth in the FAR and the CDA, after the contracting officers denied the claim. *See* 41 U.S.C. §7103; *England v. Swanson Grp., Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004). Nonetheless, the ASBCA held that there was no appealable action, leaving the contractor without recourse. Precedent is clear that the request for payment, or the amount, does not have to be in dispute, for a CDA claim to arise and incur the Board's jurisdiction to resolve outstanding issues. *Reflectone*, 60 F.3d at 1575-76.

The ASBCA and this court err in holding that since the mark-up obligation is "routine" and not disputed, there is no CDA jurisdiction to obtain its payment. The agency's refusal to pay Parson's claim, having acknowledged the obligation and having audited it through its own Audit Agency, is contrary to the guiding principle that "The Federal Acquisition System will [c]onduct business with integrity, fairness, and openness." FAR 1.102(b)(3). *See also Corliss Steam-Engine Co. v. United States*, 10 Ct. Cl. 494 (1874) (the government "must abide by its own acts and agreements, with the added obligation, because it is a government and more powerful than any individual, to deal with the individual in the strictest fairness and justice"). My colleagues' endorsement of the refusal also overlooks the Court's guidance in *I.N.S. v. Abudu*, 485 U.S. 94, 107 (1988)

that "[t]here is a strong public interest in bringing litigation to a close as promptly as is consistent with the interest in giving the adversaries a fair opportunity to develop and present their respective cases."

This lengthy litigation of a conceded governmental obligation is an embarrassment.  I respectfully dissent.