# United States Court of Appeals for the Federal Circuit

---

**SECRETARY OF DEFENSE,**
*Appellant*

**v.**

**NORTHROP GRUMMAN CORPORATION,**
*Appellee*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**NORTHROP GRUMMAN CORPORATION,**
*Appellant*

**v.**

**SECRETARY OF DEFENSE,**
*Appellee*

---

2018-1945, 2018-1990

---

Appeals from the Armed Services Board of Contract Appeals in Nos. 57625, 60190, Administrative Judge Robert T. Peacock.

---

Decided: November 15, 2019

---

DANIEL B. VOLK, Commercial Litigation Branch, Civil Division, United States Department of Justice,

Washington, DC, argued for Secretary of Defense. Also represented by JOSEPH H. HUNT, ROBERT EDWARD KIRSCHMAN, JR., PATRICIA M. MCCARTHY; ROBERT LYN DUECASTER, Contract Disputes Resolution Center, Defense Contract Management Agency, Chantilly, VA.

DONALD B. VERRILLI, JR., Munger, Tolles & Olson LLP, Washington, DC, argued for Northrop Grumman Corporation. Also represented by GINGER ANDERS; CHARLES BAEK, STEPHEN JOHN MCBRADY, NICOLE J. OWREN-WIEST, Crowell & Moring LLP, Washington, DC.

_____

Before PROST, *Chief Judge,* BRYSON and REYNA, *Circuit Judges.*

REYNA, *Circuit Judge.*

The Secretary of Defense appeals a final decision of the Armed Services Board of Contract Appeals finding that the United States Government improperly disallowed certain retirement benefits costs that Northrop Grumman Corporation asserts are eligible for reimbursement. Northrop Grumman Corporation conditionally cross-appeals the Armed Services Board of Contract Appeals' finding that the retirement benefit costs are unallowable under the applicable regulations because they were calculated using an improper accounting method. Because substantial evidence supports the Armed Services Board of Contract Appeal's finding that Northrop Grumman Corporation never claimed and will never claim any of the disputed retirement benefits, we affirm and do not reach the cross-appeal.

BACKGROUND

I. Post-Retirement Benefits Costs

This dispute concerns Northrop Grumman Corporation's ("Northrop") accounting of costs for providing post-retirement benefits ("PRB"). PRBs are non-pension

benefits that are made available to employees upon their retirement. Examples of PRBs include post-retirement health care, life insurance, disability benefits, and other welfare benefits. Relevant to these appeals is that PRBs can be modified or eliminated entirely, unlike pension benefits which cannot be modified by the employer.

The Federal Acquisition Regulation ("FAR")[1] permits contractors such as Northrop to seek reimbursement from the federal government for its PRB costs. Only those PRB costs that are "allowable," however, may be reimbursed by the government. Effective July 25, 1991, the FAR was amended to add FAR 31.205-6(o), which governed allowability of reimbursement of PRB costs in government contracts. This amendment required PRB costs assigned to a given year to be funded by that year's tax return deadline in order to be allowable. While the amendment permitted the use of accrual accounting[2] methods for PRB costs, it did not expressly require that any specific accounting standard be used. However, effective February 27, 1995, the FAR was amended again, this time to require the use of the accounting standards set out in the Statement of Financial

---

[1] The version of the FAR in effect on July 8, 2005, applies to this case.

[2] Accrual accounting (unlike cash accounting) focuses on when transactions occur, rather than when payments are made. Because PRB plans are funded well before retirement occurs and benefits are paid out, accrual accounting relies on actuarial assumptions such as life expectancy to predict future costs while allocating those costs to current years.

Accounting Standards 106 ("FAS 106")[3] to determine allowable PRB costs in government contracts.[4]

At the time of the 1995 FAR amendment, Northrop accounted for its PRB costs using an accounting method that conformed to the requirements established by the Deficit Reduction Act of 1984 ("DEFRA") rather than FAS 106. Following the 1995 FAR amendment, Northrop continued to account for its PRB costs for government contracting purposes using the DEFRA method, even though that method was no longer in compliance with the FAR.

The DEFRA and FAS 106 both require the use of accrual accounting methods, but the actuarial assumptions underlying each method are different. The primary difference between the DEFRA method and the FAS 106 method is that the DEFRA method calculates PRB costs based on current medical costs, while the FAS 106 method calculates PRB costs to include future increases in medical costs. J.A. 32. As a result, annual PRB costs computed using the DEFRA method typically start lower and increase over time whereas annual PRB costs computed using the FAS 106 method typically start higher and decrease over time. J.A. 2.

---

[3]    FAS 106 as issued in 1990 is available on the Financial Accounting Standards Board's website at https://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1218220123671.

[4]    After the February 27, 1995, amendment, FAR 31.205-6(o)(2)(iii) provided in relevant part that "to be allowable, PRB costs . . . must be measured and assigned according to Generally Accepted Accounting Principles." FAR 31.205-6(o)(2)(iii) (1995); *see also* 59 Fed. Reg. 67045 (Dec. 28, 1994). It is undisputed that the reference to "Generally Accepted Accounting Principles" in FAR 31.205-6(o)(2)(iii) refers to FAS 106. J.A. 3.

Between 1995 and 2006, Northrop filed disclosure statements with the government on numerous occasions, disclosing its continued use of the DEFRA method. The government was aware that Northrop was not in compliance with the FAR, but it did not object to Northrop's continued use of the DEFRA method because its use resulted in lower reimbursement costs to the government. J.A. 99. Indeed, had Northrop used the FAS 106 method between 1995 and 2005, the government would have paid an additional $253 million during that period. *See* J.A. 32; Oral Arg. at 15:18–15:34; *see also* J.A. 1000 (member of DCAA testifying that the government saved $253 million between 1995 and 2006). In addition, both the Defense Contract Management Agency ("DCMA") and the Defense Contract Audit Agency ("DCAA") informed Northrop during these years that the agencies found "no instances of noncompliance with applicable Cost Accounting Standards or with FAR Part 31 cost principles." J.A. 4; *see also* J.A. 3–6. Although not reflective of official policy, DCMA even used Northrop's continued use of the DEFRA method in its internal training documents as an example of acceptable accounting methods under the FAR. J.A. 10, 33.[5] At the time, DCMA members interpreted the FAR's requirement that FAS 106 method be used as setting a ceiling on allowable costs under the regulations, concluding that the difference between the DEFRA and FAS 106 calculations would not become unallowable even if not assigned and funded within a given year as required by FAR 31.205-6(o)(3).[6] *Id.*

---

[5]  Internally, there was disagreement between members of the DCMA and the DCAA about whether Northrop's continued use of the DEFRA method was acceptable.

[6]  FAR 31.205-6(o)(3) provided: "To be allowable, costs must be funded by the time set for filing the Federal

Because PRB cost calculations under the DEFRA method increase over time, and calculations using the FAS 106 method decrease over time, Northrop predicted that its PRB cost calculations using the DEFRA method would exceed those allowable under the FAR and FAS 106 in 2015. To avoid this eventuality, Northrop in 2006 switched from using the DEFRA method to using the FAS 106 method. As part of the switch, Northrop was required to calculate its "transition obligation"—the difference between the PRB costs that would have accrued had Northrop adopted the FAS 106 method in 1995 and the PRB costs that actually accrued due to its continued use of the DEFRA method. *See* 56 Fed. Reg. 41,738, 41,739 (Aug. 22, 1991); FAS 106, ¶ 110. Northrop's transition obligation in 2006 would have been approximately $305 million.

At the same time it adopted the FAS 106 method, Northrop amended its PRB plans. The amendment capped the annual amount Northrop would contribute to the PRB plans independent of future healthcare cost increases, thereby limiting the benefits available to its employees under those plans. As a result of this "negative plan amendment," Northrop's PRB cost obligations were reduced by approximately $307 million. Northrop subtracted these savings from its transition obligation, as required by FAS 106. Northrop notified DCMA of its PRB plan amendment and its switch to the FAS 106 accounting method on October 23, 2006, and November 3, 2006, respectively.

On July 26, 2007, DCMA issued a notice of its intent to disallow costs. DCMA took the position that Northrop's transition obligation was unallowable in future accounting periods because Northrop did not measure or fund its PRB

income tax return or any extension thereof. PRB costs assigned to the current year, but not funded or otherwise liquidated by the tax return time, shall not be allowable in any subsequent year." FAR 31.205-6(o)(3) (1995).

plans between 1995 and 2006 using the required FAS 106 method, and therefore failed to timely assign the unfunded difference between the higher FAS 106 amount and the lower DEFRA amount to those years. J.A. 27. DCMA issued a Final Determination on April 9, 2008, disallowing approximately $253 million of Northrop's PRB costs from its post-2006 reimbursement submissions.[7] Northrop submitted a certified claim for these funds on May 20, 2010. DCMA denied Northrop's claim on February 18, 2011. As a result of the government's disallowance, Northrop has deducted the disputed $253 million from its annual PRB cost reimbursement submissions since 2007, amortized over a 20-year period—approximately $12.7 million annually.

## II. Proceedings Before the Board

Northrop appealed DCMA's denial to the Armed Services Board of Contract Appeals ("the Board"). The Board bifurcated the proceedings into two phases—entitlement and quantum. The Board held an evidentiary hearing in each phase.

## A. Entitlement Phase

During the entitlement phase, the Board determined that Northrop's use of the DEFRA method was not in compliance with FAR 31.205-6(o). J.A. 12. The Board pointed to Northrop's concession that "there is no dispute that the DEFRA method did not comply with GAAP requirements," as required by the FAR. *Id.* The Board also found that by

---

[7] Of the $304,754,315 that constituted Northrop's transition obligation prior to factoring in its negative plan amendment, DCMA allowed $51,392,803, finding those PRB costs to be applicable to contracts awarded prior to the February 27, 1995, FAR amendment that required the use of the FAS 106 method. J.A. 1292 n.10. The remaining $253,361,512 in disallowed PRB costs is at issue in this appeal.

not using the FAS 106 method, Northrop did not timely fund its PRB obligations to the full extent permitted by the FAR. *Id.* According to the Board, this rendered $253 million of Northrop's transition obligation unallowable under FAR 31.205-6(o)(3). J.A. 12–13. The Board rejected several of Northrop's arguments, including its contention that the FAS 106 method only set a ceiling for allowable costs under the FAR and any costs up to that amount should be allowable notwithstanding Northrop's failure to fund those costs. J.A. 13–16. The Board explained that "no such language is contained" in FAR 31.205-6(o)(3), and thus the plain language of that regulation contradicted Northrop's arguments. J.A. 13.

The Board determined, however, that it could not resolve Northrop's argument that the government's disallowance was improper because the negative amendment to Northrop's PRB plans ensured that the $253 million in disputed PRB costs "have never been and will never be claimed or incurred." J.A. 16. The Board explained that there was inconsistent testimony as to whether Northrop included the unallowable costs in its reimbursement submissions in 2007 and subsequent years, and those submissions were not in the record. J.A. 11, 16. The Board left the resolution of these quantum issues until the next phase of the proceedings. J.A. 17. Northrop moved for reconsideration, which the Board denied. J.A. 19–24.

## B. Quantum Phase

During the quantum phase, the Board found that Northrop's negative amendment to its PRB plans saved $307 million from its future PRB plan obligations, "ensur[ing] that [Northrop] would not have to pay PRB costs arising from future increases in healthcare costs in excess of the fixed dollar 'cap.'" J.A. 35. The Board further found that FAS 106 required Northrop to exclude these savings from its transition obligation calculations. *Id.* (citing FAS 106, ¶ 28). Citing expert testimony, the Board explained

that because the primary difference between the DEFRA method and the FAS 106 method is that FAS 106 requires accounting for future increases in healthcare costs, "the costs that were eliminated before computing the transition obligation were the same costs that comprised the $253 million of unfunded pre-transition costs." *Id.* The Board determined that, therefore, "it would not have been possible for [Northrop] to include the $253 million of unfunded costs in its calculated PRB costs in 2007 or thereafter," meaning that Northrop could not have claimed those costs for reimbursement. *Id.* According to the Board, Northrop's use of the DEFRA method therefore "did not lead to any recovery of claimed but unfunded costs, or to duplicate recovery," and instead benefitted the government. J.A. 35–36, 40.

The Board rejected the government's argument that even though Northrop did not use the FAS 106 method between 1995 and 2006, it nonetheless still incurred the additional $253 million in PRB costs "by operation of law" due to the FAR's requirement of using the FAS 106 method. The Board stated that the government "disregards fundamental concepts related to cost 'incurrence,' and misfocuses on an 'allowability' regulation rather than [Northrop's PRB plans]." J.A. 39. The Board explained that cost incurrence is defined by Northrop's plan obligations, and thus the only costs that Northrop incurred prior to 2006 were those calculated using the DEFRA method. *Id.* The Board determined, therefore, that Northrop did not "incur" the disputed $253 million between 1995 and 2006. *Id.*

The Board also rejected the government's argument that Northrop's negative plan amendment had no effect on the costs Northrop incurred between 1995 and 2006. J.A. 37, 41. The Board pointed to the unrebutted testimony of actuaries, who testified that Northrop's transition obligation was eliminated "as a consequence" of its negative PRB plan amendment. J.A. 41. The Board noted that the government was justly concerned about allowability of

Northrop's transition obligation because the PRB costs that constituted that obligation were not timely funded between 1995 and 2006 as required by the FAR. J.A. 40–41. The Board explained, however, that Northrop's negative plan "amendment should have assuaged and eliminated the government's valid concerns here" because it "removed properly objectionable portions [from] the transition obligation." J.A. 42.

The Board further found the government's disallowance to be inconsistent with FAR 31.201-2(c), which provides that only costs "in excess of the amount that would have resulted from using practices consistent with this subpart are unallowable." J.A. 38 (quoting FAR 31.201-2(c)) (emphasis removed). The Board explained that although Northrop did not use the proper accounting method, it was undisputed that the PRB costs that Northrop calculated using the DEFRA method did not exceed the amount that Northrop could have claimed if it had used the FAS 106 method since 1995. *Id.* Combined with Northrop's negative amendment to its PRB plans, this resulted in "no excess to disallow." *Id.* (emphasis removed).

Based on its findings, the Board concluded that Northrop's negative plan amendment "ensured that [Northrop] would never incur the costs disallowed and effectively mooted allowability issues associated with the transition obligation" because Northrop "has never, and will never, claim, and the government will never pay," the disputed $253 million in disallowed costs. J.A. 41–42. Accordingly, the Board sustained Northrop's appeal, explaining that "the government suffered no damages" as a result of Northrop's noncompliance with FAR 31.205-6(o). J.A. 25, 42.

Following the Board's quantum phase decision, the government moved for reconsideration, which the Board denied on January 9, 2018. J.A. 45, 51. The Board rejected the government's argument that the quantum phase

decision was inconsistent with the earlier entitlement phase decision. The Board explained that during the entitlement phase, it only decided that Northrop failed to comply with the FAR requirement of using the FAS 106 method. J.A. 45. The Board stated that the entitlement phase decision expressly left open the issue of the resulting financial consequences of Northrop's noncompliance. J.A. 46. The Board reiterated its quantum phase finding that "it is clear beyond cavil on a fully developed quantitative record that [Northrop] never has and never will incur and claim the disallowed costs and the government never has and never will pay any 'excess' resulting from the noncompliance." Accordingly, the Board concluded that the government failed to prove its quantum damages. J.A. 51.

On appeal, the Secretary of Defense ("Secretary") asks us to reverse the Board's quantum phase decision that Northrop has never and will never claim reimbursement for the disputed $253 million in PRB costs because it did not incur those costs between 1995 and 2006. Northrop conditionally cross-appeals the Board's entitlement phase decision that the $253 million in PRB costs that Northrop failed to timely fund between 1995 and 2006 are unallowable. We have jurisdiction under 28 U.S.C. § 1295(a)(10).

## DISCUSSION

We review the Board's legal conclusions de novo. *Parsons Glob. Servs., Inc. ex rel. Odell Int'l, Inc. v. McHugh*, 677 F.3d 1166, 1170 (Fed. Cir. 2012). Interpretation and application of the FAR are issues of law that we review de novo. *Id.* We set aside the Board's factual findings only if they are fraudulent, arbitrary or capricious, so grossly erroneous as to necessarily imply bad faith, or not supported by substantial evidence. *Laguna Constr. Co., Inc. v. Carter*, 828 F.3d 1364, 1368 (Fed. Cir. 2016); *Rockies Exp. Pipeline LLC v. Salazar*, 730 F.3d 1330, 1335 (Fed. Cir. 2013) (citing 41 U.S.C. § 7107(b)(2)).

Resolution of this appeal turns on whether substantial evidence supports the Board's finding that Northrop's negative amendment to its PRB plans effectively eliminated the $253 million in disputed PRB costs from its transition obligation such that those costs were never and will never be charged to the government. We conclude that it does.

The Board found that Northrop's negative amendment to its PRB plans saved $307 million from its future PRB plan obligations, and the Secretary does not dispute this finding. J.A. 35; Appellant's Br. 27.[8] It is also undisputed that these savings resulted from capping the amount Northrop would pay in PRB costs regardless of future healthcare increases, thus removing the effect of those increases on its PRB cost calculations. J.A. 35; *see* J.A. 1539. The government also conceded that the major difference between the DEFRA method and the FAS 106 method is that the FAS 106 method accounts for future healthcare cost increases and the DEFRA method does not. J.A. 32, 177. These undisputed facts support the Board's finding that by eliminating the effect of future healthcare cost increases from its PRB obligation, Northrop's negative plan amendment eliminated "the same costs that comprised the $253 million" in dispute. J.A. 35.

The Board also cited to FAS 106, explaining that it required Northrop "to exclude obligations associated with the future health care cost increases that were eliminated pursuant" to its negative amendment prior to calculating its transition obligation. *Id.*; *see also* FAS 106, ¶ 28 ("[P]lan amendments shall be included in the computation of the expected and accumulated postretirement benefit

---

8    The Board explained that the facts were substantively not in dispute below, and that the majority of its factual findings were "in essence 'stipulated.'" J.A. 26 n.2. Accordingly, the Board adopted the undisputed facts as proposed by the parties. *Id.*

obligations." (emphasis removed)). This evidence also supports the Board's findings that the disputed $253 million in unfunded pre-transition PRB costs were never part of Northrop's transition obligation. J.A. 35.

The Board's findings are also supported by unrebutted testimony of Northrop's independent actuary expert, Mr. McQuade, on which the Board relied. *See id.* Mr. McQuade testified that Northrop's negative amendment eliminated the disputed $253 million from Northrop's transition obligation because the amendment eliminated $307 million from Northrop's accumulated post-retirement benefit obligation on which its transition obligation was based. J.A. 821–22. He also testified that the amended PRB costs and the $253 million in unfunded costs "are both based on future increases in healthcare costs," and by eliminating the effect of those increases on its PRB obligations, Northrop's amendment more than eliminated its transition obligation. J.A. 830. Mr. McQuade further testified that the government "will never pay for the $253 [million] of unfunded costs because those costs have been eliminated." J.A. 822. This testimony is substantial evidence that supports the Board's findings that it would have been impossible for Northrop to include the disputed $253 million in its post-2006 PRB cost calculations or to subsequently claim those costs for reimbursement from the government, and that as a result, the government's disallowance of those costs was improper. J.A. 35, 42.

On appeal, the Secretary frames his challenge to the Board's decision as disputing the Board's legal interpretation and application of FAR 31.205-6(o) to undisputed facts. Appellant's Br. 25; Appellant's Reply Br. 19. We disagree with this characterization. The dispute here is not over whether Northrop violated FAR 31.205-6(o) by using the DEFRA method or whether Northrop's $253 million in

unfunded PRB costs are unallowable.[9]  Rather, the Secretary disputes the Board's *factual* findings that those unallowable costs were not charged to the government by virtue of being excluded from Northrop's transition obligation by Northrop's negative amendment to its PRB plans.  As explained above, these factual findings are supported by substantial evidence and are therefore "final and conclusive." 41 U.S.C. § 7107 (2012).

We also disagree with the substance of the Secretary's arguments.  The Secretary argues that because Northrop underfunded its PRB costs by $253 million between 1995 and 2006 by using a noncompliant accounting method, those costs will always remain "unallowable" pursuant to FAR 31.205-6(o)(3), and the government is therefore required to disallow that amount from Northrop's future PRB reimbursement claims.  Appellant's Br. 25–26.  This argument would have merit had Northrop not amended its PRB plans because that underfunded amount would then have been part of the Northrop's transition obligation.  As the Board correctly explained, however, Northrop's negative plan amendment mooted the issue of allowability by eliminating the disputed $253 million from the transition obligation.  J.A. 41.  Thus, Northrop never actually submitted any unallowable costs for reimbursement, and the government had no basis to disallow that amount from Northrop's post-2006 reimbursement submissions.

The crux of the Secretary's argument is his assertion that Northrop's negative plan amendment was a separate event from its switch to the FAS 106 method.  Appellant's Reply Br. 4, 9; *see also* Oral Arg. at 4:30–4:49,

---

[9]     In its conditional cross-appeal, Northrop does challenge the Board's determination at the entitlement phase that these costs are unallowable under FAR 31.205-6(o). We do not reach this question, however, because we affirm the Board's quantum decision.

http://oralarguments.cafc.uscourts.gov/default.aspx?fl=
2018-1945.mp3.  Based on this assertion, the Secretary ar-
gues that Northrop's negative plan amendment cannot off-
set the disputed $253 million in PRB costs because had
either of these events happened without the other, the gov-
ernment would be entitled to disallow the disputed $253
million.  Appellant's Br. 25–26; Appellant's Reply Br. 4–10.
We disagree.

Both events occurred simultaneously in this case, and
Northrop's negative plan amendment had a direct effect on
its adoption of the FAS 106 method.  We agree that the
amendment did not go so far as to transform Northrop's
underfunded $253 million in PRB costs into allowable costs
under FAR 31.205-6(o).  The amendment, however, low-
ered the entire accumulated value of Northrop's PRB
plans, which was used to calculate its transition obligation.
Thus, although the amendment did not affect the allowa-
bility of the disputed $253 million, it cannot be viewed in
isolation from Northrop's adoption of the FAS 106 method
because the amendment completely eliminated Northrop's
transition obligation.

The Secretary further contends that because the two
events should be treated separately, the government is en-
titled to receive the full benefit of Northrop's negative plan
amendment.  Appellant's Br. 27; Appellant's Reply Br. 21.
The Secretary asserts that if Northrop had properly ac-
counted for its PRB costs using the FAS 106 method since
1995, then the government "would have realized the full
$307 million in cost reductions" upon Northrop's amend-
ment to its PRB plans in 2006.  Appellant's Br. 27.  Instead,
the Secretary contends, the government has been deprived
of the benefit of Northrop's amendment.  We disagree.  It
is undisputed that the government has already benefitted
by saving $253 million between 1995 and 2006 as a result
of Northrop's use of the DEFRA method.  *See* J.A. 32; *see
also* J.A. 1000 (member of DCAA testifying that the gov-
ernment saved $253 million between 1995 and 2006); Oral

Arg. at 15:18–15:34 (government's counsel conceding that had Northrop used the FAS 106 method between 1995 and 2005, the government would have paid an additional $253 million during that period). Rather than attempting to recover a lost benefit, the Secretary in essence now seeks to benefit twice from Northrop's noncompliance with FAS 106.[10]

The Secretary next argues that the Board erred by determining that Northrop never incurred the full PRB costs as calculated under FAS 106, even though Northrop calculated a lower PRB cost amount using the DEFRA method. Appellant's Br. 28–31; Appellant's Reply Br. 14–15. The Secretary contends that regardless of which method Northrop used to calculate its PRB costs between 1995 and 2006, Northrop still incurred the same PRB costs because its employees were earning their benefits during that time. Appellant's Br. 29–30; Appellant's Reply Br. 16. According to the Secretary, those costs are therefore necessarily part of Northrop's transition obligation and must be disallowed because Northrop did not timely fund those costs. Appellant's Reply Br. 16. Whether Northrop incurred these costs, however, is immaterial to our analysis because Northrop never charged the government the disputed $253 million. As a member of DCAA admitted to the Board, the government therefore "has not been damaged." J.A. 933–34. Nor can Northrop charge those costs to the government in the future because its negative amendment eliminated

---

[10] We note that the government did not object to Northrop's use of the DEFRA method while Northrop was saving the government money between 1995 and 2006. J.A. 3–5, 32–33. The government even internally approved of Northrop's accounting practices. J.A. 33. It was only after Northrop adopted the FAS 106 method and amended its PRB plans to eliminate its transition obligation that the government changed its position.

those costs from its transition obligation, as required by FAS 106. *See* J.A. 35, 38, 820–21; FAS 106, ¶ 28.

CONCLUSION

We have considered the Secretary's remaining arguments and find them unpersuasive. We conclude that substantial evidence supports the Board's finding that Northrop's negative PRB plan amendment effectively eliminated Northrop's transition obligation. We therefore affirm the Board's decision that the government's disallowance of the disputed $253,361,512 of Northrop's PRB costs was improper and dismiss Northrop's conditional cross-appeal.

**AFFIRMED**