ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Kandahar Mahali Transit & Forwarding LTD. | ) ASBCA No. 62319 |
| | ) |
| | ) |
| Under Contract No. W91B4N-11-D-7009 | ) |

APPEARANCE FOR THE APPELLANT:    Wojciech Z. Kornacki, Esq.
        Watson & Associates, LLC
        Denver, CO

APPEARANCES FOR THE GOVERNMENT:    Dana J. Chase, Esq.
        Army Chief Trial Attorney
        Robert B. Neill, Esq.
        James D. Stephens, Esq.
        MAJ Jill B. Wiley, JA
        CPT Blaine L. Hutchison, JA
        Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE O'CONNELL
ON RESPONDENT'S MOTIONS FOR SUMMARY JUDGMENT

This appeal involves a claim for approximately 900 cargo transports in Afghanistan. The government previously filed a motion to dismiss for failure to state a claim that the Board denied. *Kandahar Mahali Transit & Forwarding Ltd.*, ASBCA No. 62319, 20-1 BCA ¶ 37,635 (*KMT I*). Undeterred, the government has filed a series of motions: a motion for partial summary judgment and to dismiss in part for lack of jurisdiction, a motion for summary judgment on its release defense, a motion for summary judgment on appellant's duress argument, and a supplemental brief contending appellant failed to state a sum certain in its claim. The Board grants the motion to dismiss in part for lack of jurisdiction and for summary judgment based on a release.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

The following facts are undisputed or uncontroverted.

1. A contracting officer (CO) awarded appellant, Kandahar Mahali Transit & Forwarding Ltd. (KMT) the above-captioned contract on August 11, 2011. The contract was one of 21 contracts awarded under the National Afghan Trucking (NAT) multiple award task order contract (gov't statement of undisputed material facts on its

motion for summary judgment on the affirmative defense of release (GSUMF-R ¶ 3: R4, tab 1 at 5). The contract included a 12-month base period, along with a 12-month and a 3-month option, both of which were exercised. The base period began on September 16, 2011, and, ultimately, performance was extended to June 15, 2014. (GSUMF-R ¶¶ 4-5; R4, tab 2 at 11-13, 15; tab 47 at 3[1])

2. The contract provided for the transportation of dry and heavy cargo in Afghanistan by truck. KMT was paid specified rates for each "mission unit" of travel, which was 50 kilometers. The payments were calculated in the Afghan currency (AFN). The parties refer to each discrete trucking mission as a "Transportation Movement Request" (TMR). (R4, tab 1 at 3, 8-11; tab 36 at 18).

3. The contract provided that the work would be ordered through task orders issued by the CO (R4, tab 1 at 20). During performance the CO issued task orders numbered 0001-0006 (R4, tabs 3, 9-10, 24, 41, 47).

4. The government used a document referred to as a "mission sheet" to provide KMT with pertinent mission information, including the required pickup and delivery dates and locations. Because KMT "could [] be financially responsible" if cargo delivery could not be confirmed, the contract "encouraged" KMT to have the receiving official sign upon acceptance. Accordingly, the mission sheet provided areas for both the shipper and receiver to sign. KMT could then use the completed document in support of payment. KMT could also submit a signed memorandum or sworn statement from the customer, which it bore the responsibility to obtain. (R4, tab 36 at 29, 41; *see*, *e.g.*, R4, tab 84 at 12).

5. The billing process for the work can be summarized as follows. KMT would submit a monthly draft invoice on a form specified in the contract. The contracting officer's representative (COR) would then review the invoice and provide comments or feedback. The parties would then work through the issues and attempt to agree on whether completed missions would be classified as full payment, partial payment, no payment, or pending missions which required additional investigation. At the end of this process, KMT would upload the invoice into the government's Wide Area Work Flow (WAWF) system. KMT's WAWF submission included a spreadsheet that identified not only the TMRs for which the government had agreed to pay, but also those for which it was refusing to pay. Invoice guidance provided by the government stated that missions for which the COR and KMT disagreed could be submitted to the CO as a dispute. (R4, tab 2 at 10; tab 36 at 22, 29, 44-45; tab 582; Second Qadir affidavit at ¶¶ 4-5; Van Collie affidavit at ¶ 4, ex. G-13 at 84).

---

[1] Citations are to the .pdf page number in the electronic Rule 4 file.

<u>2014 CO Final Decisions on Unpaid TMRs</u>

6. Two COs issued final decisions in 2014 concerning more than 300 disputed TMRs (ex. G-1). Each letter in exhibit G-1 states that it is a final decision and informed KMT of its right to appeal to the Board or file a direct action in the Court of Federal Claims. While the COs agreed to pay many of the disputed TMRs (*e.g.*, *id.* at 4 (finding entitlement to AFN 4,624,435)), they denied payment on others. The COs cited a variety of reasons, including that the paperwork was missing signatures, that the TMR had been altered, or that KMT had failed to provide the original TMR (*id.* at 2 (ABK0697), 48 (ACD6211, ACE5523)). As is relevant here, the government contends that those decisions included 38 TMRs for which the CO denied payment and that KMT did not appeal until it filed the present appeal more than five years later.

7. For six of the 38 TMRs, the COs denied payment not because there was any substantive problem with the documents demonstrating that KMT had performed the work, but rather because they alleged that KMT had never submitted an invoice. They stated that KMT needed to submit an invoice before it submitted a claim. (Ex. G-1 at 11 (ABL3183) and 18-19 (ABL0133, ABL0993, ABL0996, ABL0997, ABL0998)).

8. The TMRs for which the CO cited a substantive problem such as a missing signature are: ABK0698, ABK1043, ABK0694, ABK0697, ACC5762, ACD5574, ACC4632, ACD6870,ACD6874, ACD6867, ACD6869, ACD6871, ACD6861, ACE5523, ACD6211, ACD6209, ACD6210, ACE0650, ACE0651, ACE0655, ACE0647, ACE0649, ACG1399, ACE0374, ACE0375, ACE0377, ACG5083, ACJ1751, ACJ0681, ACJ1054, ACE6489, ACB4429 (GSUMF ¶ 46; ex. G-1).

<u>The 2018 Demurrage Claim</u>

9. On February 12, 2018, or about 44 months after the contract term ended, KMT submitted a certified claim for demurrage (an agreed on penalty charge by the vendor for delays beyond the scheduled time to load or unload shipments) on Task Orders 0001, 0003, 0004, 0005 and 0006 in the amount of AFN 85,856,325.00 (R4, tabs 78, 7980).

10. CO Celeste Hobert issued a final decision on May 8, 2018. She found that KMT was entitled to a demurrage payment on 916 of the 1,337 TMRs included in the claim. She calculated the amount due as AFN 57,209,855.00 or $808,000. (R4, tab 79 at 1-3).

11. On June 28, 2018, the parties entered into a settlement agreement in which KMT agreed to accept the $808,000 calculated by CO Hobert in the final decision. Paragraph 3 of the settlement agreement contained the following language:

> This Settlement Agreement constitutes a full release and accord and satisfaction by KMT of any and all claims, demands, or causes of action, actual or perceived, known or unknown, arising under or related to this contract which formed the basis for this Settlement Agreement. Therefore, KMT remises, releases, and discharges the Government, its officers, agents, and employees of and from all civil liabilities, obligations, claims, appeals and demands which it now has or hereafter may have, whether known or unknown, administrative or judicial, legal or equitable, including attorney's fees, arising under or in any way related to the disputes which formed the basis of this Settlement Agreement.

(R4, tab 80 at 2-3)

12. The parties effectuated the settlement through the issuance of a new task order (Task Order 0007) signed by both parties. KMT's president, Abdul Qadir, signed for KMT; his signature is dated September 9, 2018. (R4, tab 81).

13. In Task Order 0007, the parties modified the release language in paragraph 3 of the settlement agreement somewhat, referring to appellant as "the contractor" rather than "KMT" and by starting a new paragraph after the first sentence and deleting the word "Therefore." Accordingly, the Task Order reads as follows:

> 3. This settlement agreement constitutes a full release and accord and satisfaction by the Contractor of any and all claims, demands, or causes of action, actual or perceived, known or unknown, arising under or related to this contract which formed the basis for this settlement agreement.
>
> 4. The contractor remises, releases, and discharges the Government, its officers, agents, and employees of and from all civil liabilities, obligations, claims, appeals and demands which it now has or hereafter may have, whether known or unknown, administrative or judicial, legal or equitable, including attorney's fees, arising under or in any

4

way related to the disputes which formed the basis of this settlement agreement.

(R4, tab 81 at 2)

14. KMT has raised a duress defense based on an affidavit from its president, Mr. Qadir, attached to the amended complaint (First Qadir Affidavit). Mr. Qadir testified as follows:

> 8. The contracting officer emailed KMT several times to sign the documents by September 19, 2018 or KMT would have to wait for funding for the next fiscal year.
>
> 9. Because KMT did not know how long this would take, KMT felt rushed to sign the documents. KMT was concerned that if it did not sign the documents before the end of the fiscal year, it would have to wait for many months to get paid.
>
> 10. The contracting officer kept telling KMT to sign the documents in many emails between June 2018 and October 2018. KMT felt it had no other option than to sign the documents and return them to the contracting officer.

15. The emails cited by Mr. Qadir in this affidavit reveal the following sequence of events:

| | |
|---|---|
| May 14, 2018 | KMT informs CO Hobert that it would accept the amount in her final decision. |
| May 23, 2018 | CO Hobert sent KMT the settlement agreement and asked Mr. Qadir to sign and return to her. |
| June 13, 2018 | The CO asked KMT about the status of signing the settlement agreement. |
| June 27, 2018 | The CO asked KMT about the status of signing the settlement agreement. |
| June 28, 2018 | KMT returned the signed settlement agreement to the CO. The CO notified KMT the same day that she would request funding. |

5

| | |
|---|---|
| August 29, 2018 | The CO asked Mr. Qadir to review and sign the task order attached to her email and to submit an invoice using the exact words she had provided under the heading "Supplies or Services and Prices." She warned that inaccuracies would delay payment. |
| August 30, 2018 | The CO informed KMT that if it wished to be paid by the end of the fiscal year KMT needed to sign and return the documents by September 10, 2018. |
| Sept. 7, 2018 | The CO reminded KMT it needed to return the documents by September 10 for it to be paid by September 15, 2018 (although, as noted above, KMT purportedly signed the task order on September 9, 2018 (SOF 12)). |
| Sept. 18, 2018 | The CO informed KMT that she was providing a final reminder that if she did not receive signed documents by the following day, KMT would have to wait for funding the following fiscal year, "and that may take several months." |
| Sept. 19, 2018 | KMT states that it sent the signed documents on September 10, 2018. |
| October 7, 2018 | KMT asks the CO about the status of payment. |
| October 10, 2018 | The CO states that she did not receive an email from KMT on September 10 or 19, 2018. The CO stated that she had called and emailed KMT several times without response. She directed KMT to resend the documents. |
| October 16, 2018 | The CO asked KMT about the status of the settlement documents and asked why responses from KMT take several weeks. |

| October 24, 2018 | The CO informed KMT that she still had not received the documents and if she did not receive a response soon, she would close out the contract. |
| --- | --- |
| October 25, 2018 | KMT sent some documents to the CO. The CO responded 29 minutes later by stating that what KMT had sent was not an invoice and was not even in the correct amount. The CO reminded KMT that she had instructed it to use the precise wording she had provided. She once again provided instructions on how to complete the invoice. |

(R4, tabs 219-221)

16. The government paid KMT for the demurrage claim in February 2019 (R4, tab 938).

The Unpaid TMRs Claim

17. On September 3, 2019, KMT informed CO Hobert that it would be submitting another claim (R4, tab 82 at 3). KMT appears to have submitted the claim on September 25, 2019, although it is dated September 4, 2019 (R4, tab 83; am. compl. ¶ 15). KMT did not submit any narrative to explain what it was seeking, but it provided the government various documents. First, there is a one-page "cover letter" that contains a (defective) claim certification in which KMT states that its claim included dry cargo trips totaling AFN 153,374,065.65, and heavy cargo trips totaling AFN 48,221,500.42, for a total claim amount of AFN 201,595,566.07 (R4, tab 83).

18. Second, the claim certification referenced 13 binders of documents "containing the whole claim and all documents related to KMT Complete Missions Claim NAT 1.0" (id.; R4, tabs 84-96). The first binder contains a spreadsheet that identifies the amount of the dry TMR claim as AFN 153,374,065.65, which is consistent with the claim certification, but there is no corresponding spreadsheet or subtotal for heavy TMRs, and thus no total amount (R4, tab 84 at 4).

19. The Army represents, and KMT does not dispute, that the 13 binders identify a total of 871 TMRs (ex. G-2). The binders contain only mission sheets and "ping" information for the GPS system that tracked the trucks (e.g., R4, tab 84 at 12-14). Paging through the first binder, one can see that many of the mission sheets lack a signature for the government shipper or receiver, or both (id. at 12, 15, 20, 27, 30, 35, 54, 66, 103, 113). The binders do not include invoices or other records that

7

demonstrate how KMT calculated the amounts in the claim certification or the spreadsheet in the first binder.

20. KMT provided a complete claim breakdown in a different spreadsheet that it submitted to the CO in September 2019 (R4, tab 82a; *see also* tab 82). The tab 82a spreadsheet lists 718 dry cargo TMRs totaling AFN 160,562,944.49, which is a different amount from the certification. The spreadsheet lists 206 heavy cargo TMRs totaling AFN 48,412,750.42, which is also different from the certification. The sum of the dry and heavy cargo amounts in the tab 82a spreadsheet is greater than in the certification. The spreadsheet lists a total of 944 TMRs, which is greater than the 871 contained in the 13 binders.

21. In response to the government's motions, KMT submitted a second affidavit from Mr. Qadir, along with a revised spreadsheet that lists the total number of TMRs as 889 but contains the same subtotals and total amount in the claim certification (Second Qadir affidavit at ¶ 2-3).

22. In response to a request for admission from the government, KMT admits that it invoiced the government for 780 of the TMRs more than six years before September 25, 2019, or more than six years before submission of the claim (gov't 2d supp. resp. on its mot. for part. sum. judg., ex. A at 27-28).

23. The government contends that as a result of the drafting process for invoices (SOF 5), KMT knew by the time it submitted an invoice which TMRs the government was refusing to pay. For example, the government points us to invoice number KMT9064, submitted on September 3, 2013, for dry cargo in the amount of AFN 44,757,790.88 (R4, tab 581). KMT submitted an extensive spreadsheet in support of the invoice. The spreadsheet, like the invoice, reflected an amount sought of AFN 44,757,790.88 (R4, tab 582). This spreadsheet lists not only the TMRs that the government had agreed to pay, but those for which it was refusing to pay (*e.g.*, listing 231 "failed missions"). For example, one of these failed missions is TMR ACF3097 (*id.* at line 347, column T). In addition to listing this as a failed mission, under "COR REMARKS" the spreadsheet that the COR verified that the truck never in-gated at its destination[2] (*id.* at column AB; gov't 2nd supp. resp. on gov't mot. for part. sum. judg. SUMF ¶¶ 41-42). On September 26, 2013, the government paid the invoice in the amount requested, AFN 44,757,790.88 (R4, tab 275).

---

[2] KMT agrees that the government has accurately described the information concerning ACF3097 but states that "this paragraph does not resolve material facts concerning whether the mission was completed" (app. resp. to 2d supp. br. at 8, ¶ 42). KMT does not tell us what these material facts are, however. The Board considers this response to be conclusory and inadequate under Board Rule 7(c).

24. The spreadsheet that is attached to the second Qadir affidavit includes TMR ACF3097. Consistent with the government's contentions, KMT identifies the government's explanation for its refusal to pay as "Verified with the 610th MCT that the truck never in-gated BAF." KMT nevertheless contends that it completed the mission and is entitled to be paid. (Second Qadir affidavit at 25, line 202). There are nearly 300 TMRs among the 889 TMRs for which the COR stated that the truck never in-gated at the destination.

25. The spreadsheet lists a variety of other reasons why the COR denied payment. All are terse but some are simple and easy to understand ("Signatures are fraudulent and match previous fraudulent documents," "no shipper signature," "[n]o signatures," "no supporting documentation" (*id.* at 22-23)). However, others are more ambiguous. By our count, for more than 400 of the TMRs the COR remark includes the word "Investigate." This appears on its own, or with further explanation that is somewhat less favorable to KMT such as "Investigate [] No ingate or outgate/Need verification via email or memo" (*id.* at 29). The record does not indicate when or if the government concluded an investigation of these TMRs or if it was awaiting further information from KMT.

26. On September 27, 2019, CO Hobert denied the claim, citing the "full release" that KMT signed in connection with the demurrage settlement (R4, tab 97 at 9).

27. KMT filed a timely appeal on December 20, 2019.

DECISION

I. <u>The Board Lacks Jurisdiction To Consider TMRs not Timely Appealed</u>

The government has moved to dismiss KMT's claim with respect to TMRs for which a CO issued a final decision in 2014 but KMT did not appeal at that time.

The Contract Disputes Act (CDA), 41 U.S.C. § 7104(a), provides that a contractor may file an appeal with the Board within 90 days of receipt of a final decision. The 90-day appeal period under the CDA is jurisdictional and may not be waived. *Cosmic Constr. Co. v. United States*, 697 F.2d 1389, 1390-91 (Fed. Cir. 1982).

None of KMT's briefs mention the word "jurisdiction." KMT also tends not to respond directly to many of the government's factual allegations – at least by following the same numbering format as the government - so that we have to search its briefs to determine what its position is. KMT's primary contention appears to be that,

9

even though the 2014 letters from the COs state that they are final decisions and notify KMT of its appeal rights, the COs were open to considering subsequent evidence from KMT and would pay individual TMRs if persuaded, rather than stand on their final decisions and force KMT to litigate. From this, KMT appears to conclude that the appeal deadlines were suspended for all TMRs. (App. resp. to mot. for part. sum. judg. at 2-6).

The Board agrees with KMT that if a contractor requests reconsideration, or if the CO indicates that she wishes to further discuss a claim, this can suspend the deadline for filing an appeal at the Board or a direct action at the Court of Federal Claims. *Guardian Angels Medical Serv. Dogs, Inc. v. United States*, 809 F.3d 1244, 1248-51 (Fed. Cir. 2016). However, it would be unwarranted to conclude that, on a contract involving hundreds of disputed TMRs, the CO's willingness to reconsider individual TMRs suspends the appeal deadline on TMRs for which the contractor did not request reconsideration. And KMT cites no evidence that it requested reconsideration of the 32 TMRs for which there was a substantive denial (SOF 8).

This brings us to the second point made by KMT: there were six TMRs for which the COs denied payment because KMT never submitted an invoice. They directed KMT to submit an invoice (SOF 7). Certainly, the COs' decisions in this respect can be viewed as a willingness to further evaluate these TMRs, which would make the decision non-final with respect to them. But this does not help KMT. If KMT never submitted an invoice for these TMRs, the agency never formally denied payment. If the agency never formally denied payment, there is no dispute for which the Board possesses jurisdiction. *Parsons Global Serv., Inc. ex rel. Odell Intern., Inc. v. McHugh*, 677 F.3d 1166, 1172-73 (Fed. Cir. 2012) (holding that the Board lacked jurisdiction because "the record does not indicate that the PCO, the appropriate government official to evaluate the request at issue, ever received a proper request for payment, such as a voucher. Without a pre-exiting dispute over its routine request, Parsons has not submitted a valid claim.").

The Board does not possess jurisdiction to consider KMT's claim with respect to the 38 TMRs identified in SOFs 7-8.

II.     Whether the TMRs are Untimely

A claim under the CDA must be submitted within six years of accrual. 41 U.S.C. § 7103(a)(4)(A). The Federal Circuit has held that "[w]hether and when a claim has accrued is determined according to the Federal Acquisition Regulation (FAR), the language of the contract, and the facts of the particular case." *Electric Boat Corp. v. Sec'y of Navy*, 958 F.3d 1372, 1375 (Fed. Cir. 2020) (citing *Kellogg Brown & Root Servs., Inc. v. Murphy*, 823 F.3d 622, 626 (Fed. Cir. 2016)). Pursuant to FAR 33.201, a claim accrues "when all events, that fix the alleged liability of either the

10

Government or the contractor and permit assertion of the claim, were known or should have been known. For liability to be fixed, some injury must have occurred. However, monetary damages need not have been incurred." In *Electric Boat*, the Federal Circuit held that the contractor's injury occurred on the date the Occupational Safety and Health Administration issued a new regulation. However, the Court held that the statute of limitations did not begin to run until the date on which the contract allowed the contractor to seek a price adjustment for a change of law (which was after issuance of the regulation). *Electric Boat*, 958 F.3d at 1376-77.

The Board has already considered the question of when a claim begins to accrue on a different National Afghan Trucking contract. In *BNN Logistics*, ASBCA No. 61841 *et al.*, 21-1 BCA ¶ 37,912 at 184,127, the Board ruled that the limitations period began to run when the contractor received a marked-up draft of the invoice showing the government's deductions. The Board rejected the contractor's argument that the period only began to run when the contractor received a reduced payment. *Accord Afghan Premier Logistics*, ASBCA No. 62938, 22-1 BCA ¶ 38,074 at 184,905 *recon. denied* 23-1 BCA ¶ 38,373.

It is not entirely clear how the Board should apply this ruling to the present appeal. KMT admits that it invoiced 780 of the 889 TMRs more than six years prior to submitting its claim (SOF 22), which would suggest that close to 90% of its claim is untimely. But the Board is not even convinced it is true that KMT invoiced 780 of the TMRs before September 25, 2013, notwithstanding KMT's admission, based on the record. The government has submitted a spreadsheet marked as exhibit G-2, which lists 871 TMRs (based on KMT's 13 claim binders) and provides a mission completion date for each one. This document shows KMT completing the 780th TMR on September 23, 2013. (The spreadsheet shows 468 TMRs completed by July 31 and 725 TMRs completed by August 31, 2013.) We doubt that KMT could have prepared an invoice, submitted it to the COR, and worked through the process of identifying payable TMRs in just two days.

Another factor is the use of the word "investigate" with respect to more than 400 TMRs (SOF 25). It is not clear what such an investigation would consist of, or who would perform it. For purposes of the present motion, the Board will assume that "investigate" when used by itself refers to a government investigation. Because we know nothing about the results of any such investigation, including the end date, the Board cannot grant summary judgment on these TMRs.

It is even less clear what we should do with TMRs marked "Investigate [] No ingate or outgate/Need verification via email or memo" (SOF 25). While our first response would be to assume a government investigation, the contract specifies that it is the contractor's responsibility to obtain a signed memorandum or sworn statement from the customer if it did not obtain a signature on the mission sheet from the

11

receiving official (SOF 4).  Thus, this COR remark could contemplate action by either party, or perhaps both, and we do not know how any of these concluded.  Summary judgment on these TMRs is denied.

However, it is also clear that, if the Board were to go through the remaining TMRs one by one, more than 400 could be time barred.  But given the Board's decision with respect to the release language in Task Order 0007 discussed below, it is not necessary to perform this analysis.  *Cf. Minesen Co. v. McHugh*, 671 F.3d 1332, 1337 (Fed. Cir. 2012) (court "decline[d] to decide [jurisdictional] issue" because it was a "complex" matter that did not need to be addressed due to the circumstances in that case).

IV.     <u>Whether KMT Provided a Full Release</u>

A.  <u>Paragraph 3 of Task Order 0007</u>

A contractor that signs a general release is barred from maintaining a claim for damages for events that occurred prior to execution of the release.  *B. D. Click Co., Inc. v. United States*, 614 F.2d 748, 756 (Ct. Cl. 1980).  While a tribunal may dislike depriving an appellant of the opportunity to prosecute its claim, "to hold otherwise . . . would go far toward destroying that certainty in business affairs which releases were designed to provide."  *J.G. Watts Const. Co. v. United States*, 161 Ct. Cl. 801, 810 (1963).  If a contractor wishes to preserve its rights to submit further claims, it should list them as an exception to the release.  *Id.* at 805.

The Board returns to paragraphs 3 and 4 of Task Order 0007:

> 3.  This settlement agreement constitutes a full release and accord and satisfaction by the Contractor of any and all claims, demands, or causes of action, actual or perceived, known or unknown, arising under or related to this contract which formed the basis for this settlement agreement.
>
> 4.  The contractor remises, releases, and discharges the Government, its officers, agents, and employees of and from all civil liabilities, obligations, claims, appeals and demands which it now has or hereafter may have, whether known or unknown, administrative or judicial, legal or equitable, including attorney's fees, arising under or in any way related to the disputes which formed the basis of this settlement agreement.

(SOF 13)

12

The Board holds that paragraph 3 of Task Order 0007 clearly contained a general or full release. Specifically, the phrases "a full release and accord and satisfaction," "of any and all claims," "actual or perceived, known or unknown," and "arising under or related to this contract" all convey that KMT was providing the broadest possible release related to this contract.

To be sure, the ending of this sentence, ". . .arising under or [ ] related to this contract which formed the basis for this settlement agreement," is a bit awkward. But we see no plausible interpretation of the limiting phrase beginning with "which" other than that it modifies the noun that it immediately precedes: contract. The Supreme Court has explained this grammatical rule - the last antecedent rule - as follows:

> imagine you are the general manager of the Yankees and you are rounding out your 2016 roster. You tell your scouts to find a defensive catcher, a quick-footed shortstop, or a pitcher from last year's World Champion Kansas City Royals. It would be natural for your scouts to confine their search for a pitcher to last year's championship team, but to look more broadly for catchers and shortstops.

*Lockhart v. United States*, 577 U.S. 347, 351-52 (2016). In this appeal, the CO perhaps could have written a nicer sentence if she had simply written "all claims . . . arising under or related to this contract" or "all claims . . . arising under or related to contract W91B4N-11-D-7009" but the meaning of the sentence conveyed by our rewrites is the same as it was in paragraph 3 of Task Order 0003. It is a release of all claims, known or unknown, for the contract at issue.

B. Paragraphs 3 and 4 of Task Order 0007 Read In Context

In interpreting the release language, we are mindful that we must construe a contract "to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract." *LAI Servs., Inc. v. Gates*, 573 F.3d 1306, 1314 (Fed. Cir. 2009) (quoting *Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002)). In our view, this requires us to consider both paragraphs 3 and 4 of Task Order 0007 in evaluating the interpretations presented by the parties.

KMT contends that it provided a limited release pertaining only to the demurrage claim. KMT does not provide a plausible interpretation of paragraph 3 of Task Order 0007 that explains why it is not a "full release" as it states. KMT's contention that paragraph 3 is a limited release has the additional drawback of making it entirely redundant with paragraph 4, which is a limited release. Paragraph 4 clearly states that the matters released relate only to "the disputes which formed the basis of this settlement agreement," that is, to the demurrage claim.

13

The government's interpretation is that paragraph 3 is a general release and paragraph 4 is a specific limited release related to the demurrage claim. This, too, is a bit redundant because a full or general release would, by implication, have released the demurrage claim. However, it is less redundant than that of KMT and we see two virtues of the government's approach.

First, if there were no paragraph 4, the demurrage claim may have been released by the language in paragraph 3, but paragraph 4 forecloses any doubts because it makes the demurrage release explicitly true rather than leaving it as implicit. Second, the demurrage claim, for which there had already been a certified claim and final decision, was a claim ripe for litigation, as opposed to those potential claims that had not been submitted to the CO. The government faced a more immediate threat of litigation related to demurrage than it did for other claims that were inchoate or merely theoretical. Accordingly, there is some logic in favor of a more in-depth treatment of the demurrage claim that recognizes the government's risk. Paragraph 4, unlike paragraph 3, releases the government from liability for attorney fees that KMT might have been entitled to if it prevailed on the claim in litigation ("all civil liabilities . . . including attorney's fees"). Paragraph 4 also makes it clear that if, unbeknownst to the CO, KMT had already filed an appeal at the Board or an action in court, that KMT was waiving the right to pursue such litigation ("all civil liabilities . . . administrative or judicial, legal or equitable").

The Board recognizes that there was some change in the language and formatting of the release language from the settlement agreement to Task Order 0007 (SOF 11, 13). But KMT has not contended that the result would be any different if the Board solely analyzed the language in the settlement agreement (we don't perceive it to be materially different) and we consider any such argument to have been waived in any event.

Finally, KMT also contends that there was no meeting of the minds with respect to releasing the claim for unpaid TMRs. The most KMT could possibly show in this respect is that it did not appreciate what it was signing when it signed Task Order 0007 (*see* First Qadir affidavit, ¶ 6). The Court of Claims disposed of a comparable argument by stating: "unilateral ignorance of one's legal rights where 'all the facts bearing on the existence of the injury were known' does not suffice to relieve one of the consequences of having released the claim." *J.G. Watts*, 161 Ct. Cl. at 810 (citing *Shepherd v. United States*, 125 Ct. Cl. 724, 742 (1953)).

C. KMT's Duress Argument

Claims may be considered after the execution of a release only in special and limited circumstances, such as where the release contains a specific exception for the

14

claim, or if the release was entered under economic duress. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1395 (Fed. Cir. 1987) (citing *J.G. Watts*, 161 Ct. Cl. at 806-07). "To render a contract unenforceable for duress, a party must establish (1) that it involuntarily accepted the other party's terms[;] (2) that circumstances permitted no other alternative[;] and (3) that such circumstances were the result of the other party's coercive acts." *N. Star Steel Co. v. United States*, 477 F.3d 1324, 1334 (Fed. Cir. 2007) (citation omitted). "Economic pressure and 'even the threat of considerable financial loss' are not duress." *Johnson, Drake & Piper, Inc. v. United States*, 531 F.2d 1037, 1042 (Ct. Cl. 1976) (quoting *International Tel. & Tel. Corp. v. United States*, 509 F.2d 541, 549, n.11 (Ct. Cl. 1975)).

KMT has not made a plausible showing that it meets any of the elements of duress. It has not identified any evidence showing that it accepted the terms of the settlement involuntarily, that it had no alternative to acceptance, or that the government engaged in coercive acts. The emails cited by Mr. Qadir in his affidavit (SOF 14) do not show any objection by KMT to the release language or any mention of it at all. It is true that CO Hobert sent KMT periodic reminders asking about the status of KMT signing documents but there is nothing coercive in her emails.

With respect to Mr. Qadir's one specific statement – that he felt pressured to sign the documents by September 19, 2018 or KMT would risk waiting months to get paid in the new fiscal year – the Board observes the following from the undisputed facts. KMT signed the settlement agreement in June 2018 (SOF 11), long before the end of the fiscal year became an issue. KMT has not identified anything that changed in the deal after the signing of the settlement agreement. Thus, KMT had already agreed to the terms of the deal long before the fiscal year deadline became an issue.

The CO did make the statement that KMT cites: on September 18, 2018 she stated that if KMT did not sign by the following day it would have to wait until the following fiscal year for funds, which might take months (SOF 15). But KMT responded by representing to the CO that it had already signed the documents on September 10, 2018 (and the task order bears a September 9, 2018 signature date by KMT (SOF 12)), or eight days before the statement that supposedly caused the duress. If KMT was truthful with the CO, it could not have felt duress from a statement that had not yet been made. Further, it is also undisputed that the CO did not actually receive the documents until after the fiscal year ended. (SOF 15-16). Thus, regardless of whether KMT actually signed the documents on September 10 and sent them to the CO, there is no evidence that shows that KMT took any action to sign the settlement documents after the CO's September 18 email and provide those documents to her by the following day.

KMT also does not provide any evidence that the CO's statement about the timeline to obtain new funding in the next fiscal year was untrue. Budgets, fiscal years

and the complexities of government appropriations are simply a fact of life in government contracting and present challenges when the agency is trying to settle a contract claim. *See National Science Foundation-Potential Antideficiency Act Violation by the National Science Board Office*, B-317413, 2009 CPD ¶ 94 (Comp. Gen. April 24, 2009) ("Generally, costs of a settlement are to be paid using appropriations current at the time of settlement. . . . payment is chargeable to appropriations current at the time of final action on the settlement because the settlement creates a new right in the successful claimant").

Interwoven with KMT's duress contention is an argument that the release, to the extent that it goes beyond the demurrage claim and also releases the TMR claim, fails due to a lack of consideration. The Board disagrees. KMT received valuable consideration of $808,000. Even if KMT was entitled to this money and the TMR claim was entirely valid, the release is still enforceable. *Inland Empire Builders, Inc. v. United States*, 424 F.2d 1370, 1375-76 (Ct. Cl. 1970).

## CONCLUSION

KMT's claim with respect to the TMRs identified in SOFs 7-8 is dismissed for lack of jurisdiction. The Board grants the government summary judgment on the remainder of KMT's claim. Accordingly, the appeal is denied.[3]

Dated: February 13, 2024

MICHAEL N. O'CONNELL
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

(Signatures continued)

---

[3] Due to our rulings, the Board need not address the government's contention that the appeal should be dismissed because KMT's claim failed to state a sum certain.

16

I concur                                        I concur

OWEN C. WILSON                          J. REID PROUTY
Administrative Judge                   Administrative Judge
Acting Chairman                        Vice Chairman
Armed Services Board                 Armed Services Board
of Contract Appeals                    of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62319, Appeal of Kandahar Mahali Transit & Forwarding LTD., rendered in conformance with the Board's Charter.

Dated:  February 13, 2024

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

17