ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| Platinum Services, Inc. | ) ASBCA Nos. 62199, 62200 |
| | ) |
| Under Contract Nos. W91ZLK-09-D-0001 | ) |
| W91QV1-11-D-0003 | ) |
| W91QV1-11-D-0004 | ) |
| W91QV1-11-D-0006 | ) |

APPEARANCES FOR THE APPELLANT: Anthony J. Marchese, Esq.
Carol L. O'Riordan, Esq.
 O'Riordan Bethel Law Firm, LLP
 Washington, DC

APPEARANCES FOR THE GOVERNMENT: Dana J. Chase, Esq.
 Army Chief Trial Attorney
 MAJ Heather M. Martin, JA
 LTC Julie A. Glascott, JA
 Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE HARTMAN
ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

Platinum Services. Inc. (PSI) seeks payment of 26 invoices it submitted to the Department of the Army (Army) in 2010 to 2013 under four contracts for the provision of moving services. The Army has moved for summary judgment, contending PSI's claims are time-barred by the Contract Disputes Act (CDA) six-year statute of limitations. PSI does not dispute that its claims for a final contracting officer (CO) decision regarding the invoices were submitted more than six years after the last date it submitted any of the unpaid invoices. It contends, however, that this Board should equitably toll the statute of limitations with respect to the claims. For the reasons stated below, we grant the Army's motion and deny the appeals.

STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

From 2009 to 2011, appellant, Platinum Services, Inc. (PSI) received four indefinite-delivery, indefinite-quantity (IDIQ), firm-fixed-price requirements contracts from the Army to provide services for the shipment and/or storage of household and other goods of military service members. The contracts had an initial base period of 12 months, contained four option periods each of 12 additional months, and provided for an Army "Ordering Officer" to place service delivery orders to PSI. Funding for

service delivery orders issued to PSI was tied administratively to a service member's orders to "change duty station," and the Army had to submit the service member's duty change orders to the Defense Finance and Accounting Service (DFAS) for payments to be issued to PSI for its work performance. Service members' orders were not among the paperwork generally provided to PSI, nor required to be submitted by PSI to the Transportation Office at Fort Belvoir, which by late 2012 was PSI's designated point of contact for payment issues with respect to all four contracts. (R4, tabs 1 at 32 & 35-38, 16 at 243-44, 248, 26 at 577, 585-86, 590, 33 at 1001-02, 1006; answer ¶ 6, 26, 28, 31; Federal Acquisition Regulation (FAR) 52.216-18 (ORDERING (OCT 1995)); 52.216-21 (REQUIREMENTS (OCT 1995)) [1]

The four contracts all incorporated by reference FAR 52.232-25, PROMPT PAYMENT (OCT 2008), which requires contractors to submit billing statements to the designated payment office (52.232-25(a)(3)), and with respect to payment of those invoices, states in pertinent part --

> (a) *Invoice Payments* -- (1) *Due Date.* (i) Except as indicated in paragraph (a)(2) and (c) of this clause, the due date for making invoice payments by the designated payment office is the latter of the following two events:
>
> (A) The 30[th] day after the designated billing office has received a proper invoice from the Contractor . . . .
>
> (B) The 30[th] day after Government acceptance of . . . services performed. . . .
>
> . . .
>
> (c) *Fast payment procedure due dates.* If this contract contains the clause at [FAR] 52.213-1, Fast Payment Procedure, payments will be made within 15 days after the date of receipt of the invoice.

(R4, tabs 1 at 34, 16 at 236, 26 at 578, 33 at 994) Paragraph (a)(2) of this clause sets forth special provisions if the contractor invoices are for supply of certain food products. None of PSI's contracts here involved provision of any food products. Also, none of PSI's contracts here included the "fast payment" clause referenced in

---

[1] The documents in the Rule 4 file and its supplement that were submitted by the government are all stamped with Bates numbers beginning with zeros. We cite to these Bates numbers but omit the initial unnecessary zeros.

paragraph (c). The contracts, however, incorporated by reference FAR 52.233-1, DISPUTES (JUL 2002) which provides:

> (a) This contract is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613) [(CDA)].
>
> (b) Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.
>
> (c) "Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking as a matter of right the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract. **However, a written demand or written assertion by the Contractor seeking the payment of money exceeding $100,000 is not a claim under the Act until certified. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the Act.** The submission may be converted to a claim under the Act by complying with the submission and certification requirements of this clause, if it is disputed either as to liability or amount or is not acted upon in a reasonable time.
>
> (d)(1) A claim by the contractor shall be made in writing and, unless otherwise stated in this contract, **submitted within 6 years after accrual of the claim to the Contracting Officer for a written decision**.

(Emphasis added) (R4, tabs 1 at 34, 16 at 236, 26 at 578, 33 at 994) Three of PSI's contracts were awarded by Army contracting personnel located at Fort Belvoir, VA and one (Contract No. W91ZLK-09-D-0001) by contracting personnel at Aberdeen Proving Ground, MD. (R4, tabs 1 at 1, 16 at 191, 26 at 507, 33 at 922).

The parties do not dispute that PSI performed services under the contracts from 2010 to 2012 pursuant to delivery orders issued under the contracts and then submitted invoices for its services to the Army in order to be paid for those services. While PSI ultimately was paid hundreds of thousands of dollars by the Army under the contracts (*see* app. supp. R4, tabs 137 at 2121-22, 229 at 2307), there were 26 invoices submitted that were never paid. The Army does not dispute that PSI performed the work in question or that PSI's invoices for that work were properly submitted. Rather,

3

as discussed below, it appears that the change of duty station orders for the service members moved by PSI were lost as a result of computer problems and not available to be submitted by the Army to DFAS.

Beginning in 2012, the Army informed PSI it was having difficulty locating copies of service members' change of station orders for delivery orders performed by PSI. In April, the Army stated in an email that "[t]he only invoices we have in our office are the ones that . . . need orders" and "[a]ll other invoices were sent to . . . DFAS[]" for payment. (App. supp. R4, tab 63 at 1982) PSI and the Army exchanged more than 70 emails during 2012 regarding non-payment issues (app. supp. R4, tabs 55 – 88)). The following exchange occurred on October 9 --

> Army: Since taking over this position, I am trying to clear up old invoices. I will let you know if I need anything else regarding this move.
>
> PSI: Thank you, I really appreciate you trying to clear these up! We have over half a million still due us from 2011 alone.
>
> Army: No problem at all! I will be happy to see them gone, LOL. One quick question: Do you ever see the service member's orders?
>
> PSI: Rarely but sometimes we do get them. If I have them I attach it with the invoice. Let me know if you need me to check the files for any.
>
> Army: No you don't need to go looking for them. I just notice that the majority of the invoices that are held up seem to be because they are waiting for a copy of the orders.

(App. supp. R4, tab 79 at 2011-13) Ten days subsequent, the Army informed PSI that "I have been threatening people with my first born if they don't find orders :)" and, "by the end of the day, I will have a count for you of invoices from 2011 and 2012 that were submitted [to DFAS]." Later, the same day, the Army stated "attached is what I, personally, have submitted since October 1, 2012," and "hopefully we are starting to make a dent in the old stuff." (App. supp. R4, tab 84 at 2022-23) The next week, the Army sent PSI, per the request of PSI's President, a list of the invoices currently "waiting on orders" of duty station change to be sent DFAS (app. supp. R4, tab 86 at 2029).

In 2013, PSI and the Army exchanged over 60 emails regarding nonpayment issues (app. supp. R4, tabs 89-121)).  For example, in April 2013, the Army asked PSI to forward its prior emails listing invoices awaiting payment so it could ascertain the dates that its personnel forwarded the invoices to DFAS.  PSI responded it had been informed that its Army contact was waiting for service members' change-of-duty-station orders to forward the invoices for payment and once again sent its requested November 2012 emails listing unpaid invoices to the Army.  (App. supp. R4, tab 102 at 2059)  During July 2013, PSI found a change-of-duty-station order for one of the unpaid invoices and additionally sent it to the Army (app. supp. R4, tab 111 at 2081).

During 2014, PSI and the Army exchanged 25 emails regarding non-payment issues under the contracts (app. supp. R4, tabs 122-34)).  PSI's President, Mario Smoot, informed the Army in February 2014 (app. supp. R4, tab 122 at 2098) that it was awaiting payments of nearly a half million dollars and many of the unpaid invoices were over two and a half years old (app. supp. R4, tab 122 at 2098)  In response, an Army Division Chief asked agency personnel to give him "an update on $ owed Mario" (*id.* at 2097).  Months later, in November, the Division Chief again asked Army personnel for an update regarding lack of invoice payment to PSI (app. supp. R4, tab 133 at 2111).

Because PSI was concerned about the lack of progress in payment of its invoices, it elevated the issue to an Army CO in 2015, exchanging some 134 emails regarding its lack of payment (app. supp. R4, tabs 135-169)).  During February 2015, PSI President Smoot informed the CO and other Army personnel as follows:

> I have tried very hard to work with you in resolving the open invoices from 2011.  But it seems like all I hear is excuses.  I realize that you and your staff are short handed however I need to get this resolved now.  We have spoke[n] many times and we have provided you with all the documents over and over.  I know you are trying but this will not pay my bills.  It is not my fault that your system crashed and all the orders were lost.  Nor is it yours, but I can't afford to wait any longer to receive the estimated open amount of $1,200,000.00 that has been unpaid for over 3 years now.  Please let me know what will be the next step taken to resolve this issue and how we can help.

(App. supp. R4, tab 137 at 2121-22)  The CO responded that she was not familiar with the PSI non-payment issues (other than an unrelated settlement agreement the parties had negotiated), she had nothing to do with paying invoices, and would "look into the issue" (*id.* at 2119-22).  At the direction of PSI's President, Mr. Smoot, a PSI

5

representative provided the CO with information she requested and thanked her for her offer to help with the matter (*id*.). In late spring, the CO advised PSI: she had been working on the non-payment issues with DFAS for almost two months; it has been very difficult to obtain funding from all the different agencies (Air Force, Navy, Army, etc.); Army lawyers were involved in the matter; and she would update PSI as efforts progressed (app. supp. R4, tab 138 at 2124). With the CO's involvement, the Army made progress in paying amounts owed. Throughout 2015, the Army processed payment for a number of PSI's "old DPM invoice[s]" and provided updates on payment. For example, the Army advised PSI a list of invoices attached to the Army's email had been submitted that date to DFAS for payment. PSI responded in April 2015 by thanking the Army for its efforts, and by noting "we have a long way to go." It stated its list of remaining unpaid invoices totaled $990,619.89. (App. supp. R4, tab 139 at 2127) In its effort to process PSI's old invoices, the Army even contacted another contractor that had performed part of the moving services for a service member PSI had moved to ascertain if that contractor had a copy of the service member's change of station orders needed to process payment for PSI. The contractor, however, replied that it did not have a copy of those orders, noting "[w]e hardly ever get the [service member's] orders." (App. supp. R4, tab 168 at 2196-97)

During 2016, PSI and the Army exchanged over 130 emails regarding non-payment issues, including the following –

> Army: I sent 23 new invoice[s] up to DFAS already but it is difficult for me to see what's been paid because I cannot see the invoice or contract number. Can you tell me if anything [has] been paid off the sheet you sent me.
>
> PSI: Updated list attached of all open invoices. I can email you each time we receive a payment, no problem.
>
> Army: You don't have to send the list but you can send the name. You can wait until you get more than one. I sent out a lot of email and the orders are coming in now. I just need to resen[d] them if over two week go by with no payment. . . . I only have about 10 more email to try to get order. If I get the orders, they can be paid. So far I am waiting on payment for about 25 or more. I will have more to submit soon. Thank you for all your help in getting these invoices off my desk.

(App. supp. R4, tab 197 at 2254-56; (app. supp. R4, tabs 170-225)) PSI believed that significant progress was now being made with respect to its unpaid invoices (app. supp. R4, tabs 198-225)).

In 2017, PSI and the Army exchanged 54 emails regarding non-payment issues under the contracts (app. supp. R4, tabs 226-243)).  By March 2017, the Army managed to locate many of the missing change of duty station orders needed for invoice payment and pay PSI for much of its work under the contracts.  However, more than $350,000 in open unpaid PSI invoices remained.  (App. supp. R4, tab 229 at 2307)  In June 2017, the Army told PSI it was continuing to work to pay PSI the "over aged DPM invoices" (app. supp. R4, tab 231 at 2311).

By the start of 2018, the Army reduced the amount it owed PSI for contract invoices to $147,959.49 (app. supp. R4, tab 243 at 2332) and continued working on having outstanding invoice payments made to PSI, as evidenced by the Army's February 1 email stating --

> Just spoke to DFAS and sure enough it didn't pay yet.
> They have put in an elevated ticket to expedite it.  They are
> also checking on Cason.  I will let you know once I hear.
> If I do not hear by Monday I will call them again.
> I appreciate your patience!

(App. supp. R4, tab 244 at 2334)  In 2018, the Army and PSI exchanged more than 40 emails regarding invoice non-payment issues (app. supp. R4, tabs 244 – 51)).  On November 27, 2018, the following email exchange occurred –

> PSI:  Thank you so much Ms. Pam!  What about the rest of
> these going back to 2011?  Is there a reason we are not
> getting these paid?  Do you need new copies of paperwork
> or are you still trying to obtain orders?  We need an update
> please on what is being done.  Thank you again!
>
> Army:  Hi Carie, Tiera Hadin is now handling the over
> aged invoices.
>
> PSI:  Good afternoon Ms. Hardin.  Do you need any info
> for the attached past due invoices?  What do we need to do
> to get these processed?
>
> Army:  Hello Ms. Galusha.  These invoices are a part of
> the Over age project.  The reasoning why these invoices
> have not been paid is because of the lack of orders with the
> funding information.  All of the Overage invoices we are
> working by branch of service and submitting them to
> DFAS once I obtain orders I can use for payment.  As of
> right now, I am working the [N]avy invoices and

submitting them when I can find orders that are acceptable. I will go through your list to make sure I have all of these invoices and reach out to you if I'm missing any. Thank you for your patience!

(App. supp. R4, tab 249 at 2344-46)

During 2019, PSI deemed Army progress on finding missing service members' change of duty orders and payment of outstanding PSI invoices to have "slowed to a near stand-still" (Appellant's Proposed Finding of Fact ¶ 42). As a result, PSI's law firm sent the following email on February 6, 2019, to Army CO Quinn "initiating a dialogue" with the Army –

> Our firm is counsel for [PSI], a DPM moving and storage contractor who has held several contracts administered by your office.
>
> Due to what we understand to have been a computer crash/database related issue impacting MICC, [the Mission & Installation Command,] payment for a number of [PSI] invoices has been delayed.
>
> . . . .
>
> Attached is a list of the invoices outstanding.
>
> From my conversations with MICC staff, it is my understanding that . . . you are the CO handling the outstanding issues on these contracts. Please let me know if that is not the case. I'd like to speak with you to determine if there is a way to get the open invoices on these contracts paid, and the contracts closed out.

(R4, tab 40 at 1302) About one week later, by email dated February 14 to CO Quinn, PSI counsel added –

> [A]ttached is some correspondence that I believe will help explain this [PSI lack of payment] issue further. The second attached email is a note from the transportation office Voucher Examiner, explaining that certain [PSI] invoices could not be processed out from the transportation office to DFAS, because the service member's Orders could not be located. It's our understanding that

transportation office records, including the needed service members' Orders, were lost due to a computer crash. This was back in 2012. As you'll see, many of the invoices listed by the Voucher Examiner as held up due to lack of Orders back in 2012 overlap with the invoices that show as still open based on PSI's records (attached to my email).

. . . .

For DPM contracts, the carrier sends its invoices to the transportation office where they are approved. The transportation office then sends the invoices to the appropriate DFAS office for payment. Payment is then processed through WAWF. [PSI] has not reached out to WAWF because WAWF never received these open invoices, so it isn't like WAWF rejected them or there is a hold-up [that] is with them. The hold up, we believe, is with Ft. Belvoir's transportation office – voucher examiner branch.

As we understand it, all of these currently open invoices have been approved by the transportation office [(TO)] as payable, but have not been sent out from the [TO] for payment because the TO needs to locate the service member's Orders so that they can submit to DFAS for payment.

So that is the heart of the issue. Locating and providing service member's Orders is not something [PSI] can assist with. It is [PSI's] understanding that the [TO] has worked to obtain the needed orders from the various service branches, but has had some difficulties.

[PSI] has meanwhile been patient, but we need to come up with a path forward to resolve the matter and get these contracts closed out.

(R4, tab 43 at 1522-23) By email dated February 25, 2019, CO Quinn advised PSI that "[o]ur legal team is looking into any alternate ways of getting you paid for your work provided" and "I will reach out to you once I hear back from them" (R4, tab 43 at 1518-19).

PSI's counsel advised as follows –

> We understand that the contracting office is looking for ways to address this matter. A few clarifications:
>
> [PSI] did not wait to bring this issue to the agency's attention.
>
> [PSI] timely submitted its invoices for payment years ago, back when the services were performed. Mr. Thomas and many other agency officials have been aware of this issue since at least 2012 . . . . Our understanding is that transportation office personnel have been working to track down the service member's Orders for several years, but have not been successful with respect to [locating] the invoices that still remain open. That is why we have contacted you to help bring this matter to resolution.
>
> . . . The [TO] has not submitted these invoices to DFAS for payment because they cannot locate the service member's Orders apparently needed to do so. However, the agency still owes [PSI] for these services, and [PSI] cannot just go unpaid indefinitely.
>
> Since, as you note, there may be little hope that the missing orders actually get located at this point, the agency will need to find a different mechanism by which to pay [PSI]. We have . . . found that due to the complexities of funding for DPM programs, for certain debts the agency has had to make payment from funds that are allocated for the resolution of disputes. That is the path we will have to pursue in this matter . . . (essentially obtaining a judgment) if another workable path is not identified.

(R4, tab 43 at 1519-20) About 50 days later, on April 16, 2019, after its email exchanges "did not identify a path to resolution of th[ese] matter[s]" PSI submitted a "request for a final decision" seeking in excess of $100,000 to CO Quinn, who was then responsible for the three Fort Belvoir contracts (R4, tab 45 at 1617). The unpaid invoices under the Fort Belvoir contracts were as follows:

| | Date | Name | Amount |
|---|---|---|---|
| **W91QV1-11-D-0003** | | | |
| | 10/25/2011 | Cecil, Kevin | 425.00 |
| | 07/09/2011 | Quintero, Alfredo | 156.00 |
| **Contract Total** | | | **581.00** |
| **W91QV1-11-D-0004** | | | |
| | 07/19/2011 | Avalos, Elizabeth | 6,160.00 |
| | 12/26/2012 | Hall, Thomas | 3,830.32 |
| | 12/28/2012 | Harris, Michael | 973.88 |
| | 12/28/2012 | Hill, Valyncia | 1,776.90 |
| | 07/23/2012 | Irsik, Larry | 3,996.04 |
| | 08/01/2011 | Johnson, Tony | 1,582.00 |
| | 12/28/2012 | Lee, John | 275.27 |
| | 04/02/2013 | Padilla, Leyla | 4,297.44 |
| | 12/26/2012 | Pilkington, Stephanie | 5,218.00 |
| | 10/25/2011 | Trowbridge, Robert | 416.88 |
| | 04/02/2013 | Woodfin, Joseph | 17,175.06 |
| **Contract Total** | | | **45,701.79** |
| **W91QV1-11-D-0006** | | | |
| | 07/19/2011 | :Clabaugh, Jo | 26,924.68 |
| | 01/21/2013 | :Garcia, Julio | 4,743.15 |
| | 07/23/2012 | :Garner, Patrick | 6,038.45 |
| | 07/25/2012 | Hudson, Donnie | 9,925.89 |
| | 10/24/2011 | Miller, Brian K | 340.38 |
| | 07/25/2012 | Morton, Lisa | 7,442.24 |
| | 06/18/2011 | White Jr, Matthew | 9,563.50 |
| Contract Total | | | **64,978.29** |
| **TOTAL** | | | **$111,261.08** |

On June 13, 2019, the CO responded that PSI's submission did not constitute a claim because it was not certified (R4, tab 46 at 1649) and, if it was deemed to be a claim, it was barred by the six-year statute of limitations:

> The shipment files show that the services connected with these invoices were performed between May 12, 2011 (T. Johnson) and September 18, 2012 (V. Hill). The accrual of the claim was when the alleged liability should have been known, which would be the last date of the service of each move. The latest date that any part of the claim began to accrue was September 18, 2012, which

> means that any claim filed after September 18, 2018
> is barred by the six-year statute of limitations.

(*Id*. at 1650)  On June 25, 2019, PSI sent the CO a certified claim for the 20 unpaid invoices under the three contracts that had been awarded by Army personnel at Fort Belvoir a "request for a final decision" seeking $111,261.08.  PSI stated this claim was timely due to "equitable tolling" (R4, tab 48 at 1664-65).  On July 19, 2019, PSI submitted to another Army CO a second certified claim for six different PSI invoices totaling $13,833.82 under its contract awarded by the Aberdeen Proving Ground (R4, tabs 12-15).  The claim under the Aberdeen contract consists of invoices dated from July 25, 2011 to January 22, 2013 for services PSI provided between June 28, 2010 and January 10, 2012 (R4, tabs 40, 42 at 1462-66, 43).  On September 18, 2019, the CO for the three PSI Belvoir contracts denied PSI's certified claim as barred by the statute of limitations (R4, tab 54).  One week later, PSI appealed the deemed denial of its Aberdeen contract claim (docketed as ASBCA No. 62199) and the CO's final decision on the 20 unpaid invoices under the Belvoir contracts (docketed as ASBCA No. 62200).

The Army has moved for summary judgment, contending PSI's claims for amounts due and owing under the four contracts are time-barred under the CDA because they were submitted to a CO more than six years after they accrued.  PSI contends that the claims are timely because the six-year statute of limitations should be equitably tolled.  In a declaration appended to the contractor's opposition to the Army's summary judgment motion, PSI's President states that the Army's loss of service members' orders to change station, documents needed to compensate contractors for services provided to the military, was, in his experience, "extraordinary" action that justifies tolling the statute of limitations (app. opp'n, Ex. A ¶ 6).  He asserts that loss of that paperwork, in conjunction with Army promises to pay PSI for its services as soon as it could (and the Army's progress in making payments) "induced [PSI] to hold off in pursuing a claim" (*id*. ¶ 13).

## DECISION

The standards set forth in FED. R. CIV. P. 56 guide us in resolving a motion for summary judgment.  *Cubic Defense Applications, Inc.*, ASBCA No. 58519, 18-1 BCA ¶ 37,049 at 180,378; *Dongbuk R&U Eng'g Co.*, ASBCA No. 58300, 13 BCA ¶ 35,389 at 173,637.  We will grant summary judgment only if a moving party demonstrates there is no genuine issue as to any material fact, and it is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987).  A material fact is one that may affect the outcome of the decision.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

In resolving summary judgment motions, we draw all reasonable inferences in favor of the non-moving party.  *Celotex*, 477 U.S. at 322-24; *Elekta Insurance S.A.*

12

*v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1306 (Fed. Cir. 2000). When a moving party meets its burden of establishing the absence of disputed material facts, a non-moving party must set forth specific facts, rather than conclusory statements or bare assertions. A "non-movant runs the risk of a grant of summary judgment if it fails to disclose the evidentiary basis for its claim." *See Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 627 (Fed. Cir. 1984); *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 835-36 (Fed. Cir. 1984).

Under FAR 33.201, the accrual of a claim is defined as the date when all events that fix the alleged liability of either the government or contractor, and permit claim assertion, were known or should have been known. "For liability to be fixed, some injury must have occurred . . . [but] monetary damages need not have been incurred." *Triple Canopy, Inc. v. Sec'y of the Air Force*, 14 F.4d 1332, 1339 (Fed. Cir. 2021) (quoting FAR 33.201); *Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315, 1320 (Fed. Cir. 2014) (same).

To determine when claims accrued and the events that fixed the alleged liability were known, we must examine the legal basis for those claims. The legal basis for the asserted claims here are the four PSI contracts and invoices PSI submitted to the Army for contract work it performed. *Triple Canopy*, 14 F.4d at 1339; *Cubic Defense*, 18-1 BCA ¶ 37,049 at 180,376.

The Army argues that PSI's payment claims for each invoice at issue accrued on the last day that PSI performed work for which it was seeking payment in the invoice because it knew or should have known of its claim against the Army on that date. While the Army correctly sets forth the "general" standard for determining claim accrual with respect to "non-routine" requests for payment under the CDA, FAR 33.201, it errs by failing to recognize that the invoices for work PSI performed pursuant to its Army contracts are "routine," not "non-routine," submissions under the CDA. The costs set forth in the invoices originate from specified contract work PSI performed. None of the work was additional or unforeseen work performed at the Army's behest. To be paid for contract work performed, PSI was to submit invoices for that work to the Army and did so. Because PSI's invoices were submitted under its Army contracts and in accord with its contract work performance, they are "routine." *See, e.g., Parsons Glob. Servs., Inc. v. McHugh*, 677 F.3d 1166, 1170 (Fed. Cir. 2012); *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1542-43 (Fed. Cir. 1996); *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575-76 (Fed. Cir. 1995) (*en banc*). Where a request for payment is "routine," a pre-existing dispute is necessary for it to constitute a "claim" under the CDA. *Parsons Glob. Servs.*, 677 F.3d at 1170; *Reflectone*, 60 F.3d at 1576 & n.6. Neither of the parties here contends that the PSI invoices were "in dispute" at time of submission. Thus, contrary to the Army's assertions, no payment "claims" accrued prior to or at time of PSI invoice submission. *See Reflectone*, 60 F.3d at 1575 ("we must assess whether a particular demand for

13

payment constitutes a claim, based on the FAR implementing the CDA, the language of the contract in dispute, and the facts of the case"); FAR 52.233-1(c), Disputes (JUL 2002).

Fixing the date of accrual of a claim requires first that there is a "claim" as defined in the CDA and associated FAR regulations. *Kellogg, Brown & Root Servs., Inc. v. Murphy*, 823 F.3d 622, 626 (Fed. Cir. 2016); *Cubic Defense,* 18-1 BCA ¶ 37,049 at 180,376. Here, the Army contracts required that PSI submit invoices for costs of contract work to the Army for payment and that the government essentially had 30 days from invoice receipt to review the submissions and, if proper, make payment to PSI or make payment 30 days from Army acceptance of PSI's work if later. FAR 52.232-25. Since the Army set forth in its four contracts administrative procedures to obtain reimbursement for contract performance, PSI could not pursue a CDA "claim" for invoice payment until those mandatory pre-claim procedures were pursued and it was evident there was a dispute regarding payment of the invoices. *See, e.g., Triple Canopy*, 14 F.4d at 1339-40; *Kellogg, Brown & Root*, 823 F.3d at 628; *Parsons Glob. Servs.*, 677 F.3d at 1170; *accord Martinez v. United States*, 333 F.3d 1295, 1304 (Fed. Cir. 2003) (*en banc*). Supreme Court precedent provides that the statute of limitations will not begin to run when a claim cannot be pursued because mandatory pre-claim procedures have not been completed. *See Crown Coat Front Co. v. United States*, 386 U.S. 503, 511-12 (1967) (pre-CDA case finding contractor's claim "first accrued . . . upon the completion of the administrative proceedings contemplated and required by the provisions of the contract"); *accord Triple Canopy*, 14 F.4d at 1340; *Parsons Glob. Servs.*, 677 F.3d at 1171-72 (because the contractor's request was "routine," it must be in dispute before contractor can submit "a written demand [to CO] . . . seeking, as a matter of right, the payment of money in a sum certain" (quoting FAR 2.101)); *Nager Electric Co. v. United States*, 368 F.2d 842, 852 (Ct. Cl. 1966) (contract claim accrues when the contractor could ordinarily demand his money and bring suit if payment was not made).

In these appeals, it is undisputed that: PSI provided moving services to the Army under four contracts which the Army accepted; PSI submitted invoices for those services to the Army in accord with the four contracts; and the Army failed to pay PSI for those services as required by the contracts. In sum, PSI performed services and submitted 26 invoices for those services to the Army on the following dates: July 20, 2010; June 18, 2011; July 9, 2011; July 19, 2011; July 25, 2011; July 26, 2011; August 1, 2011; October 24, 2011; October 25, 2011; March 2, 2012; April 16, 2012; July 23, 2012; July 25, 2012; December 26, 2012; December 28, 2012; January 21, 2013, January 22, 2013; and April 2, 2013. (R4, tabs 40 at 1304-64; 41 at 1380-87, 1388-1414, 1428-46; 42 at 1462-1506; 43 at 1507-12, 1528-96).

PSI's invoices were thus required to be paid by the Army under the contracts, respectively, on or about the following dates: August 19, 2010; July 18, 2011;

14

August 8, 2011; August 18, 2011; August 24, 2011; August 25, 2011; August 31, 2011; November 23, 2011; November 24, 2011; April 1, 2012; May 16, 2012; August 22, 2012; August 24, 2012; January 25, 2013; January 27, 2012; February 20, 2013; February 21, 2013; and May 2, 2013. On these latter dates, all events fixing liability for the unpaid contract invoices were or should have been known. *See Oceanic Steamship Co. v. United States*, 165 Ct. Cl. 217, 225 (1964) (claim against United States based upon a contract obligation to pay accrues upon the date when payment becomes due and is wrongfully withheld); *Bernard Cap Co.*, ASBCA No. 56679 *et al.*, 10-1 BCA ¶ 34,387 at 169,800; FAR 33.201.

PSI's certified claims for payment of the 26 invoices submitted to the COs for the issuance of final decisions were dated June 25, 2019, and July 19, 2019, and thus were submitted by PSI to the COs for final decisions more than six years after each invoice payment claim accrual date, the latest of which was on or about May 2, 2013. It is well established that the CDA, 41 U.S.C.§ 7103(a), formerly codified at 41 U.S.C. § 605(a), mandates a contractor submit a claim to a CO for a final decision within six years of accrual of that claim. *Kellogg, Brown, & Root Servs, v. Murphy*, 823 F. 3d 622 (Fed. Cir. 2016); *Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315 (Fed. Cir. 2014); *Arctic Slope Native Ass'n v. Sebelius*, 583 F.3d 785, 793 (Fed. Cir. 2009). Subject to any applicable tolling of the statutory period, "the timely submission of a claim to a [CO] is a necessary predicate" to our resolution of a contract dispute governed by the CDA. Because PSI's certified claims were submitted to the COs more than six years after their accrual they are barred, absent a suspension of the six-year limitations period.

PSI argues that the six-year statute of limitations should be deemed to have been suspended or equitably tolled with respect to its 26 invoice payment claims at issue in these appeals. Its President states in a declaration appended to its summary judgment motion opposition that the Army's loss of military service members' orders to change duty station was, in his experience, "extraordinary" action justifying tolling of the statute of limitations. He asserts that loss of that paperwork, in conjunction with Army promises to pay PSI for its services as soon as it could (and the Army's progress in making payments) "induced [PSI] to hold off in pursuing a claim." (Smoot decl. ¶ 6, 13)

Tribunals have typically extended equitable relief only sparingly. They have allowed equitable tolling where a claimant has actively pursued its remedies by filing a defective pleading during the statutory period or where a complainant was induced or tricked by an adversary's misconduct into allowing the filing deadline to pass. They generally have been less forgiving when a claimant has failed to exercise due diligence in preserving its legal rights. *E.g., Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990); *Martinez*, 333 F.3d at 1318-19; *Hopland Band of Pomo Indians v. United*

*States*, 855 F.2d 1573, 1580 (Fed. Cir. 1988); *Welcker v. United States*, 752 F.2d 1577, 1580 (Fed. Cir. 1985).

Here, PSI was fully cognizant of its claims of contract breach premised upon lack of payment. PSI's contracts set forth the government's duty to pay invoices, i.e., defined the time by which the government was required to pay. When the duty to pay timely was breached, all events necessary to fix liability existed and established the date of accrual of that claim. FAR 33.201. Each failure to pay within 30 days of invoice receipt for services accepted by the agency and invoiced in accord with a PSI contract comprised a separate and discreet wrong under a PSI contract for which PSI could "claim" relief. Unfortunately, it did not do so within the six-year limitations period for any of the 26 invoices at issue.

While the government's loss of financial data due to a computer "crash" or other problem is unfortunate, it is not highly unusual in today's technologically based society. That the Army was to submit each service members' change of duty station orders (along with PSI invoices for moving services furnished) in order to have DFAS generate payment to PSI was not specified in the contracts and was an administrative duty or obligation of the Army. The means by which DFAS elected to pay an invoice received from the Army accordingly had no bearing on when a breach claim accrued or on PSI's ability to submit claims to a CO regarding unpaid contract invoices. *See Bernard Cap Co.*, 10-1 BCA¶ 34,387 at 169,800-01. PSI does not state how a computer crash mislead it with respect to the length of the CDA six-year statute of limitations. Misleading conduct by an adversary can be a basis for equitable tolling if a party has been induced or tricked by its adversary into allowing a deadline to pass when a party has been pursuing its rights diligently and some extraordinary circumstance stood in the way to prevent timely submission of its claim. *Abozar Afzali*, 20-1 BCA ¶ 37,673 at 182,892; *Khenji Logistics Grp.*, ASBCA No. 61178, 18-1 BCA ¶ 37,674, citing *Arctic Slope Native Ass'n v. Sebelius*, 583 F.3d 785, 798 (Fed. Cir. 2009). "Extraordinary circumstance analysis" examines whether circumstances rendered "critical information, reasonable investigation notwithstanding, undiscoverable." *Kamaludin Slyman CSC*, ASBCA Nos. 62006, 62007, 62008, 2021-1 BCA ¶ 37,849 at 183,795, citing *Gould v. U.S. Dept. of Health and Human Servs.*, 905 F.2d 738, 745-46 (4th Cir. 1990). For example, in *Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 1232 (1959), a litigant was allowed to proceed where it showed its opposing party had represented to it that it had seven years to sue, despite the statute of limitations running after only three years. Accord *Irwin v. Dept. of Veterans Affairs*, 408 U.S. 89, 96 (1990); *Dobyns v. United States*, No. 2021-2309, slip op at 11 (Fed. Cir. May 10, 2024).

Instead of submitting its contract breach claims to an Army CO for final decision within six years of each one's accrual, PSI waited for more than six years after each claim's accrual. The Disputes clause of PSI's Army contracts set forth its

16

ability and requirement to submit contract claims to COs for a final decision. FAR 52.233-1. PSI was free during the six-year limitations period here to submit claims for final decisions regarding its invoice payments, bring a subsequent protective action, and move for a suspension or stay of proceedings while it further attempted to negotiate resolution of its claims with the Army. *E.g., Brighton Village Assocs. v. United States*, 52 F.3d 1056, 1060 (Fed. Cir. 1995). It is well-established "[t]here is no . . . inconsistency between" the submission of a claim and "an expressed desire to continue to mutually work toward a claim's resolution." *Reflectone*, 60 F.3d at 1583 (quoting *Transamerica Ins. Corp. v. United States*, 973 F.2d 1572, 1579 (Fed. Cir. 1992)); *accord Zafer Constr. Co. v. United States,* 40 F.4th 1365, 1367-68 (Fed. Cir. 2022). "[P]arties are not prevented or discouraged from settling their differences because the first written demand for payment as a matter of right that is not merely a routine request for payment is recognized and treated as a CDA 'claim.' If anything, such a rule promotes settlement by preventing procrastination." *Reflectone*, 60 F.3d at 1583.

It is admirable PSI was very patient with Army efforts to resolve computer problems that arose during performance of the contracts and made repeated efforts to amicably resolve the unpaid invoices. We recognize a stated purpose of the CDA is to "induce resolution of more contract disputes by negotiation prior to litigation . . . ." S. REP. NO. 95-1118, at 1 (1978); *see also Zafer,* 40 F.4th at 1370 (quoting H. R. REP. NO. 95-1556, at 5 (1978) (the "purpose of the proposed legislation as amended is to provide for . . . administrative and judicial procedures for the settlement of claims and disputes relating to Government contracts.")). Pursuit by PSI, however, of an amicable resolution of its invoice payment claims did not preclude or interfere with its ability to satisfy the statute of limitations here. *See, e.g., Welcker*, 752 F.2d at 1583 (statute of limitations not tolled by "litigative timidity"); *Henry Prods. Co. v. United States*, 180 Ct. Cl. 928, 930 (1967) (settlement talks do not toll statute of limitations once cause of action has accrued). Indeed, mere continuance of settlement negotiations (even where a government representative has expressed a view that settlement is likely) does not constitute a reason to extend the limitations period. *See, e.g., Brighton Village*, 52 F.3d at 1061; *Cuban Truck & Equip. Co. v. United States*, 333 F.2d 873, 879 n.15 (Ct. Cl. 1964); *accord Henry Prods. Co.*, 180 Ct. Cl. at 930-31.

PSI was responsible for determining whether to submit its claims to an Army CO and bring actions in a timely fashion. *See, e.g., Frazer v. United States*, 288 F.3d 1347, 1353 (Fed. Cir. 2002); *Boling v. United States*, 220 F.3d 1365, 1374 (Fed. Cir. 2000) (declining to equitably toll statute of limitations even where a substantive action appeared futile during limitations period). Failure to bring the contract breach claims within the statute of limitations period were judgments for which PSI was responsible. In sum, PSI is responsible for the consequences of its judgments, including the risk that they were incorrect. *See Irwin*, 498 U.S. at 96.

In addition to PSI's failure to exercise diligence, the type of governmental action necessary to invoke equitable tolling here is plainly lacking. In the event of late filed submissions, equitable tolling is available only if the "lateness" is attributable, at least in part, to misleading government action. *See Bailey v. West*, 160 F.3d 1360, 1364-65 (Fed. Cir. 1998) (*en banc*) (noting if government misled claimant into missing submission deadline, such inducement by an adversary may allow equitable tolling of limitations period even absent trickery or misconduct) rev'd *Henderson v. Shinseki*, 589 F.3d 1201, 1215 (Fed. Cir. 2009) (en banc), rev'd 562 U.S. 428 (2011); *Juice Farms, Inc. v. United States*, 68 F.3d 1344, 1346 (Fed. Cir. 1995) (citing *Irwin*, 498 U.S. at 96) (equitable tolling allowed if government by its misconduct tricks its adversary into missing submission deadline). There is no allegation or evidence in the record that any Army representative gave PSI incorrect or misleading legal advice, tricked PSI into missing the six-year submission deadline, or engaged in affirmative misconduct with respect to the four contracts at issue. The Army, as it was required to do by the PSI contracts, took administrative actions to obtain payment of PSI's contract invoices. Throughout its performance of those actions, various Army personnel advised PSI of the status of its ongoing efforts. There is no allegation or evidence here that the Army ever advised PSI it need not submit invoice payment claims to a CO within six years of claim accrual or that the statute of limitations period for its claims would be extended. *See Electric Boat Corp. v. Sec'y of the Navy*, 958 F.3d 1372 (Fed. Cir. 2020) at 1376; *Frazer*, 288 F.3d at 1354 (agency conduct not affirmatively misleading); *Bonneville Associates, Ltd. Partnership v. Barram*, 165 F.3d 1360, 1366 (Fed. Cir. 1999) (Circuit held in *Bailey* that given special relationship between veterans and government, veteran was misled by VA conduct into allowing deadline to pass). PSI therefore has not presented an equitable basis to support the tolling of the statutory limitations period.

Federal Circuit precedent makes clear that equitable tolling against the United States is a narrow doctrine. Mere "excusable neglect" is not enough to establish a basis for equitable tolling. There "must be a compelling justification for delay," such as inducement or trickery by the misconduct of one's adversary into allowing a filing deadline to pass. What transpired in these appeals falls short of those situations in which equitable tolling has been applied. This is not a case where a party endeavors to meet a statutory time deadline but fails to do so due to a minor technical error or inadvertent mistake. *See, e.g., Bonneville Associates*, 165 F.3d at 1366. Further, the injuries PSI incurred were not inherently unknowable at date of claim accrual and the Army did nothing to conceal its actions breaching the parties' contracts resulting in those injuries. *See, e.g., Martinez*, 333 F.3d at 1318-19; *Welcker*, 752 F.2d at 1580. PSI was aware of the existence of its injuries and the acts giving rise to its claims, as evidenced by its numerous emails to the Army regarding invoice monies contractually due it.

In sum, these are not appeals where a claimant has received inadequate notice of its claims or where affirmative misconduct upon the part of the government lulled an appellant into inaction. The simple fact is that PSI's contracts set forth what it must do to preserve its claims, and PSI did not do it. *Baldwin Co. Welcome Ctr. v. Brown,* 466 U.S. 147, 151 (1984). Consequently, PSI cannot show entitlement to equitable tolling of the limitations period.

To the extent that PSI is asserting that the Army should be equitably estopped from asserting the CDA statute of limitations in these appeals, it must set forth facts showing some affirmative agency misconduct. *Frazer,* 288 F.3d at 1354; *Zacharin v. United States*, 213 F.3d 1366, 1371-72 (Fed. Cir. 2000). While the Supreme Court has not expressly held that affirmative misconduct is a prerequisite for invoking equitable estoppel against the government, the Federal Circuit has, *see id.*; *Henry v. United States*, 870 F.2d 634, 637 (Fed. Cir. 1989); *Hanson v. Office of Personnel Management*, 833 F.2d 1568-69 (Fed. Cir. 1987), as well as every other federal court of appeals. *Tefel v. Reno*, 180 F.3d 1286, 1303 (11th Cir. 1999) (collecting cases). As discussed above, PSI has not asserted or shown any specific Army actions here that would support existence of affirmative misconduct under the more stringent standard applicable to equitable estoppel.

It is unfortunate that the parties were not able to resolve these appeals amicably. It is not disputed that: PSI performed the contractual services for which it invoiced the Army; those services were accepted by the Army; PSI communicated frequently with Army personnel regarding its lack of invoice payment; PSI made efforts to assist the Army in locating change of duty station paperwork lost due to government computer problems (and other information that the Army desired) that PSI was not required contractually to supply in order to receive contract invoice payments from DFAS; Army personnel expressed gratitude to PSI for its assistance with and patience in obtaining DFAS payments; and the parties ultimately were able to procure belated payment of all but 26 PSI contract invoices. Personnel for both parties here worked to facilitate issuance of belated invoice payments under difficult circumstances, *i.e.*, the loss of computer data associated with government funding for PSI's four contracts.

The lack of payment to PSI for contractual services performed and accepted by the Army is troubling. It presents difficult circumstances for resolution of equitable tolling claims. We note that opportunities remain for the parties to resolve the appeals amicably because further litigation is possible with respect to the claims. Appeals presenting difficult circumstances for the application of existing tolling law, such as these, could ultimately produce legal precedent undesirable to one or all of the

19

parties. A resolution of the claims by the parties, therefore, may produce a more desirable result for both.[2]

Our role is to apply existing law governing contract claims. We are bound by, and adhere to our understanding of, controlling legal precedent regarding the use of equitable tolling and estoppel. Procedural requirements Congress has established for obtaining judicial review should not be disregarded by a tribunal based upon sympathy for a particular litigant. As the Supreme Court has stated in *Baldwin Co*, 466 U.S. at 152, "experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law."

CONCLUSION

We grant the Army's motion for summary judgment because there are no material facts in dispute to defeat the Army's assertion that the claims appealed were submitted more than six years after accrual and thus beyond the statute of limitations. The appeals are denied.

Dated: August 1, 2024

TERRENCE S. HARTMAN
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

---

[2] PSI may have an additional avenue of relief available to it if it petitions Congress. Congress has recognized existence of a right that fails to meet strict legal standards but nevertheless is of a moral or an equitable proportion. *United States v. Realty Co*., 163 U.S. 427, 440 (1896). In view of this right which a claimant may have against the United States, Congress has authorized the Court of Federal Claims to entertain claims merely moral in character and founded upon conscience. Such claims are commonly referred to as Congressional Reference cases. *See, e.g,,* Stanley J. Purzycki, *The Congressional Reference Case in the U.S. Court of Claims*, 10 Cath. U. L. Rev. 35 (1961); 28 U.S.C. § 1492; 28 U.S.C. § 2509; *Zadeh v. United States*, 11 F. Supp. 248, 124 Ct. Cl. 650 (1953).

I concur                                                I concur


OWEN C. WILSON                                J. REID PROUTY
Administrative Judge                             Administrative Judge
Acting Chairman                                    Vice Chairman
Armed Services Board                           Armed Services Board
of Contract Appeals                              of Contract Appeals


      I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA Nos. 62199, 62200, Appeals of
Platinum Services, Inc., rendered in conformance with the Board's Charter.


      Dated:



                                  PAULLA K. GATES-LEWIS
                                  Recorder, Armed Services
                                  Board of Contract Appeals